DORA POWELL, As Administratrix of the Estate of TIMOTHY GWAN POWELL (Deceased) v. S & G PRESTRESS COMPANY, THE ARUNDEL COMPANY, MICHAEL MEANS and RICHARD SCHOUTEN

No. 935SC572

(Filed 19 April 1994)

**Workers' Compensation § 62 (NCI4th)— employee crushed by crane—employer not engaged in intentional misconduct**

In an action to recover for the wrongful death of plaintiff's intestate who was crushed by a straddle crane while he worked for defendant, plaintiff's forecast of evidence was insufficient to show that defendant employer intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death where the evidence tended to show that defendant's policy was that the straddle crane was not to be operated without a signal man and at the time of death this policy was being enforced; no employees of defendant had been struck by a crane in the past; defendant's past safety violations did not concern the hazards of operating a crane in close proximity to workers; and there were no safety regula-

**POWELL v. S & G PRESTRESS CO.**

[114 N.C. App. 319 (1994)]

tions which required Prestress to use tire guards or keep its employees a certain distance from moving cranes.

**Am Jur 2d, Workers' Compensation §§ 75-87.**

**What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

Judge WYNN dissenting.

Appeal by plaintiff from orders signed 15 February 1993 and 18 February 1993 in New Hanover County Superior Court by Judge Frank R. Brown and judgment signed 11 March 1993 in New Hanover County Superior Court by Judge Judson D. DeRamus, Jr. Heard in the Court of Appeals 21 March 1994.

Plaintiff, the administratrix of the estate of Timothy Powell, brought this wrongful death action to recover damages in her representative capacity for the death of her son, Timothy Powell. The decedent, Timothy Powell, was employed at the time of his death by S & G Prestress Company (Prestress). Prestress manufactures reinforced concrete elements used in the construction of bridges and foundations. The Arundel Company is the parent company of Prestress. At the time of Timothy Powell's death, Michael Means was the Vice President of Prestress. He was in charge of day-to-day operations and administered the safety program. Richard Schouten was the President of Prestress.

Plaintiff filed the complaint in this action on 3 January 1991, and by amended complaint filed 26 November 1991, plaintiff added defendants Prestress, The Arundel Company, and Michael Means. On 5 February 1993, all defendants moved for summary judgment. By order dated 15 February 1993, Judge Brown granted summary judgment in favor of Michael Means and Richard Schouten, and by order dated 18 February 1993, Judge Brown granted summary judgment in favor of The Arundel Company. By judgment dated 11 March 1993, Judge DeRamus granted Prestress' motion for summary judgment. From these orders and judgments plaintiff appeals to this Court.

*William H. Dowdy for plaintiff-appellant.*

*Johnson & Lambeth, by Beth M. Bryant and Robert White Johnson, for defendants-appellees.*

WELLS, Judge.

Plaintiff contends that the trial court erred by granting defendants' motion for summary judgment because there exist genuine issues of material fact regarding the liability of defendants for their alleged intentional misconduct based on *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991). We disagree.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56.

The forecast of evidence reveals the following. Timothy Powell, the decedent, age 22, was a temporary employee of Prestress which hired him from a temporary employment agency. Prestress regularly employed approximately 15 temporary employees. Temporary employees were provided with hardhats and safety glasses but were not given any safety training. Prestress did not provide temporary employees with its safety manual.

Powell began work at Prestress on 22 November 1989 and worked 9.24 hours on that day. He next returned to Prestress on 29 November 1989, the day of the accident. On the day he was killed, Powell was one member of an eight-person crew working on one of two forming beds used to construct concrete elements. His job was to attach reinforcing bars to the forming beds before the concrete was poured. The two forming beds run parallel to one another, and an overhead crane straddles the forming beds. The crane has four rubber wheels approximately 16 inches wide and 45 inches high. Two wheels move on the outside of each forming bed. The crane travels only forward and backward along the length of the forming beds. The wheels are approximately 3 to 5 feet from the forming beds, and it is necessary for employees working on the forming beds to work, often with their backs to the wheels, between the wheels and the forming bed as the crane moves past them. The crane has a maximum speed of 4 miles per hour. On each side of the crane were motion alarms which sounded loudly any time the crane was in gear, whether or not the crane was moving. The wheels of the crane were not equipped with tire guards although guards were available, and Prestress had recently purchased a straddle crane which was equipped with tire guards. No law required such tire guards. Prestress' policy was that the crane

was not to be moved without a signal man directing the forward and backward movement of the crane. Prestress did not train any of its employees in signaling nor were there any uniform signals. None of its employees were designated specifically as signal men. Rather, any employee could serve as the signal man on any particular occasion.

On the date of Powell's death, there was, in addition to the crew with which he was working, another crew working on the other forming bed. This crew was further ahead in preparing its forming bed than was Powell's crew and required the use of the crane to move tarps on top of its forming bed. Anthony Brewer, who had worked at Prestress for over 5 years, operated the crane which carried the tarps. Brewer had a driver's license but is legally blind in his right eye. The tarps measured 42 feet by 15 feet. The crane moved backward, past Powell, to pick up a tarp and began moving forward at full speed toward him. The crane carried the tarp while the unsecured end was held by another worker. Brewer could not see Powell because the tarp obstructed his vision. Powell's left foot was caught under the wheel, and before the crane could be stopped, it traveled the length of his body, crushing and killing him.

The accident report of the North Carolina Department of Labor reveals the following about the factors which contributed to the accident. The motion alarm was sounding at the time of Powell's death but "[t]he size of the crane and the location of the alarm devices [were] such that the alarm sound [did] not produce a warning of imminency of danger. The sound seem[ed] remote from the point of danger." Prestress did not instruct employees to move away from the crane when it was moving past them. Instead, employees were expected to remain working between the wheels and the forming beds. Although there were no specific requirements for tire guards on straddle cranes, "[t]he guards would prevent standing employees being caught in the nip point created by the tires and the ground by pushing or knocking the employee out of the way. . . . A prudent employer would have installed guards on existing equipment after becoming aware of their availability and feasibility." As to the operation of the crane, no mechanical defects were detected, and there was no indication that the crane was operated recklessly. Brewer's vision impairment was not a factor in the death of Powell because the tarp obstructed his view of him. Concerning the employer's knowledge, the report provides

POWELL v. S & G PRESTRESS CO.

[114 N.C. App. 319 (1994)]

that Prestress knew that crews frequently worked in close proximity to the crane and in overlapping areas such that the crane aided one crew while passing another which was performing tasks unrelated to the crane operation. According to the report, Prestress could have provided adequate protection to employees working in close proximity to the crane by adding tire guards and requiring nonessential employees to move away from the operation of the crane.

Mr. Brewer's statements contained in the report and in his deposition reveal that when he was operating the crane he checked the location of the crew members before moving. He believed that all employees were clear of the crane's path. Mr. Brewer also stated that, although he could not remember who was signaling him, he was being signaled to move forward at the time of Powell's death. The accident report identifies a temporary employee named Orlando Chisolm as the person giving signals at the time of Powell's death. Mr. Chisolm was never located. Herbert Tyson, crew chief of Powell's crew, and Leroy Pridgen, Jr., the crew chief of the other crew, both testified that the policy was that a signal man should always be directing the movement of the crane and that they thought there was a signal man at the time of Timothy Powell's death. However, neither man could identify who was signaling at the time of Powell's death.

The North Carolina Department of Labor cited Prestress for 4 violations — 3 of which were serious — of the Occupational Safety and Health Act. Prestress was cited twice for violating G.S. § 95-129(1) (requiring employer to furnish to employees conditions of employment and a place of employment free from recognized hazards that are causing or likely to cause death or serious injury) for failing to protect employees working in close proximity to straddle cranes and for permitting Mr. Brewer to operate a crane without meeting the minimum physical requirements. The citation provided that Prestress could rectify the hazard by providing tire guards, training signal persons, and prohibiting workers within 5 feet of a moving crane. The fines from these violations totaled $1,540.

Prestress had twice previously been cited for violations of the Occupational Safety and Health Act for incidents involving unsafe crane operations. In 1979, the North Carolina Department of Labor cited Prestress for violation of 29 C.F.R. § 1910.179(d)(2) and (3) and 29 C.F.R. § 1910.23(c)(1) for failing to provide a railing and footwalk on a crane. In 1983, the North Carolina Department

of Labor cited Prestress for violation of 29 C.F.R. § 1910.180(j)(1)(i) for its failure to allow a minimum clearance of 10 feet between the top of a crane boom and an electrical power line which resulted in the death of one employee.

Plaintiff offered the affidavit of William Dickinson, the Vice President and Associate Director of the Crane Institute of America, in which he stated:

> Based upon my review of the conditions attendant at the time of the crane death of Timothy Powell, as nearly as such can be determined based upon the statements of the persons who were present, and who were deposed and who spoke with the OSH[A] investigator and to the police, as well as my own review of reports and the scene, my conclusion is that the procedures and practices that were being followed by Prestress violated industry-wide standards regarding operation of cranes in proximity to workers, that new and inexperienced workers were placed into a work environment that was unsafe even for experienced personnel, that Prestress did not observe such common industry rules as maintaining clear passage and aisle ways in obstructed fashion, and that Prestress did not maintain barriers between dangerous machinery, i.e. cranes and its workers working within 36-40 inches of same, and thereby created an extremely and exceedingly high likelihood that the crane would come into contact with the workers and based upon the facts that existed, such was substantially certain to occur. . . .

The question for our determination is whether the forecast of evidence is sufficient to show that Prestress intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death. *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991). If plaintiff's forecast of the evidence is sufficient to show that there is a genuine issue of material fact as to whether Prestress' conduct meets the substantial certainty standard, then plaintiff is entitled to have her claim against Prestress tried by a jury. We conclude that plaintiff's forecast of evidence is not sufficient to raise such a material issue of fact against Prestress.

In *Woodson*, our Supreme Court explained the continuum of tortious conduct as follows:

**POWELL v. S & G PRESTRESS CO.**

[114 N.C. App. 319 (1994)]

The most aggravated conduct is where the actor actually intends the probable consequences of his conduct. One who intentionally engages in conduct knowing that particular results are substantially certain to follow also intends the results for purposes of tort liability. Restatement (Second) of Torts § 8A and comment b (1965) (hereinafter "Rest. 2d of Torts"). "[I]ntent is broader than a desire. to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 8, at 35 (5th ed. 1984) (hereinafter "Prosser"). This is the doctrine of "constructive intent." "As the probability that a [certain] consequence will follow decreases, and becomes less than substantially certain, the actor's conduct loses the character of intent, and becomes mere recklessness. . . . As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence." Rest. 2d of Torts § 8A, comment b.

*Woodson, supra.*

The misconduct which satisfies the substantial certainty standard is best demonstrated by the following illustration provided by the Restatement (Second) of Torts:

A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that this act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

Restatement (Second) of Torts § 8A illus. 1 (1965). Substantial certainty requires more than a mere possibility or substantial probability of serious injury or death. *Hooper v. Pizzagalli*, 112 N.C. App. 400, 436 S.E.2d 145 (1993); *Dunleavy v. Yates Construction Co.*, 114 N.C. App. 196, --- S.E.2d --- 1994). *See also Zocco v. Department of Army*, 791 F. Supp. 595 (E.D.N.C. 1992).

The forecast of evidence in this case persuades us that Prestress did not engage in misconduct *knowing* it was substantially certain to cause serious death or injury. All the evidence showed that Prestress' policy was that the straddle crane was not to be operated without a signal man and that, at the time of Powell's death, this

policy was being enforced. Plaintiff presented no evidence that Prestress had a policy to allow cranes to be moved without a signal man. Unlike the employer in *Woodson*, Prestress did not permit work to go on without an arrangement to carry out a policy designed to protect the safety of its employees. Assuming *arguendo* that a reasonable juror could determine that by permitting employees to work in close proximity to a moving straddle crane, the risk of serious injury or death as a result of contact with a crane was present, then the forecast of evidence is not sufficient to show that these circumstances were substantially certain to cause Powell's injury and death. No employees of Prestress had been struck by a crane in the past. Prestress' past violations involving crane operation do not concern the hazards of operating a crane in close proximity to workers. There were no safety regulations which required Prestress to use tire guards or keep its employees a certain distance from moving cranes. The circumstances of Powell's death demonstrate that Prestress could have taken further steps to ensure the safety of its employees who worked in close proximity to straddle cranes, but the forecast of evidence is not sufficient to show that there exists a genuine issue of material fact regarding whether Prestress engaged in misconduct knowing it was substantially certain to cause serious injury or death. Summary judgment in favor of Prestress must therefore be affirmed.

Plaintiff's remaining assignments of error concern the entry of summary judgment in favor of Prestress' corporate officers, Michael Means and Richard Schouten, and Prestress' parent company, The Arundel Company. Since the forecast of evidence fails to disclose that Means and Schouten were actual participants at the time of the alleged wrongful activity, they cannot be held liable. *Woodson, supra.* Having found the subsidiary company not liable, we do not reach the question of the liability of the parent company, The Arundel Company. Accordingly, plaintiff's remaining assignments of error are overruled.

The orders and judgments appealed from are

Affirmed.

Judge ORR concurs.

Judge WYNN dissents in a separate opinion.

**POWELL v. S & G PRESTRESS CO.**

[114 N.C. App. 319 (1994)]

Judge WYNN dissenting.

The majority correctly identifies the question for our determination as "whether the forecast of evidence is sufficient to show that Prestress intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death." The majority also correctly states our standard of review, that summary judgment should be reversed "[i]f plaintiff's forecast of the evidence is sufficient to show that there is a genuine issue of material fact as to whether Prestress' conduct meets the substantial certainty standard." However, I reach a different result than the majority.

This case presents an opportunity to revisit the standard of employer culpability set forth in *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991). Prior to *Woodson*, an employee sustaining a workplace injury could not recover against the employer outside the Workers' Compensation Act unless the injury was the result of an intentional tort committed by the employer. *Barrino v. Radiator Specialty Co.*, 315 N.C. 500, 340 S.E.2d 295 (1986), *overruled, Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991). This was a very difficult standard to meet, as a plaintiff would have to show that the employer intended its acts to result in actual injury or death to the employee. *Id.* at 507-8, 340 S.E.2d at 300. The *Barrino* majority quoted with approval the leading workers' compensation treatise:

> [T]he common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of genuine intentional injury.
>
> . . . .
>
> Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, wilfully failing to furnish a safe place to work, or even wilfully and unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of accidental character.

*Id., quoting* 2A Larson, The Law of Workmen's Compensation § 68.13 (1984) (omission in original).

The *Woodson* Court recognized that there could be situations in which, although the employer did not actually intend to injure an employee, the employer's conduct was so egregious that it was "tantamount to an intentional tort." *Woodson*, 329 N.C. 341, 407 S.E.2d at 228. In trying to find a standard that would address such situations, the Court considered the "willful and wanton" standard, under which an employee may hold a *co-employee* civilly liable for injuries. *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985). The Court declined to apply the willful and wanton standard to employers' conduct because of the countervailing policies of the workers' compensation scheme. The Court reasoned, "[I]t is also in keeping with the statutory workers' compensation trade-offs to require that civil actions against employers be grounded on more aggravated conduct than actions against co-employees. Co-employees do not finance or otherwise directly participate in workers' compensation programs; employers, on the other hand, do." *Woodson*, 329 N.C. at 342, 407 S.E.2d at 229.

Instead, the Court established a standard in between the intentional tort and willful and wanton standards, known as the "substantial certainty" standard. The Court held that a civil action may be pursued against an employer when "an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct." *Id.* at 340-41, 407 S.E.2d at 228.

After establishing the "substantial certainty" standard, the *Woodson* Court did not further define it, except as it found the *Woodson* facts met it. The majority's bomb-throwing example, taken from the Restatement of Torts, sets a higher standard than that actually applied by the Court in *Woodson*. Although *Woodson* cited the Restatement, it did not expressly adopt it. Thus, the *Woodson* facts provide the authoritative understanding of "substantial certainty" as intended by our Supreme Court.

In *Woodson*, the Court found that reasonable jurors could conclude that defendant knew of the substantial certainty that the conditions would cause serious injury or death where: defendant was experienced; he had been cited for safety violations similar to the one causing the death; he was aware of safety regulations

designed for such conditions; and an experienced foreman testified that the conditions were unsafe.

With this standard in mind, I evaluate plaintiff's forecast of evidence as follows. "[I]n a summary judgment proceeding, the forecast of evidence and all reasonable inferences must be taken in the light most favorable to the non-moving party." *Id.* at 344, 407 S.E.2d at 231. Taken in the light most favorable to plaintiff, the evidence tends to show the following: Decedent was a temporary worker, on his second day on the job, who had received no safety training. He was placed in a workspace in which a crane lacking tire guards regularly passed within as little as 36 inches of him, often behind his back. The crane had an inadequate alarm and the policy requiring a signal man may not have been followed. After the incident, the worksite was cited by the North Carolina Department of Labor pursuant to N.C. Gen. Stat. § 95-129(1) for failing to protect employees working in close proximity to straddle cranes and for permitting crane operators to work without meeting minimum physical requirements. There was additional evidence that the site violated industry standards by allowing new and inexperienced workers to be placed into an unsafe work environment; by failing to maintain clear passage and aisle ways; and by failing to maintain barriers between the workers and the dangerous cranes. I conclude that a reasonable juror could determine from this evidence that serious injury or death was a "substantial certainty rather than an unforeseeable event, mere possibility, or even substantial probability." *Id.* at 345, 407 S.E.2d at 231.

Again, in the light most favorable to the plaintiff, there is evidence that defendant Prestress knew of this substantial certainty. Prestress regularly employed temporary workers such as decedent. Prestress did not provide these workers with any safety training nor with a copy of its safety manual. The company knew that crews frequently worked in close proximity to the moving crane. Instead of instructing workers to move away from the crane when it moved past them, Prestress expected workers to remain working between the wheels and the forming beds as the crane moved behind their backs. Prestress knew that, although it had a policy requiring a signal man to direct the crane, it did not train any of its employees in signaling, there were no uniform signals, and none of the employees was designated as a signal man.

As in *Woodson*, the plaintiff here has forecast evidence that Prestress had a practice of hiring untrained workers; it had twice been cited for safety violations in its crane operations; there were safety violations at the time of the incident; and, according to expert testimony, under the conditions existing at the time, it was substantially certain that the crane would come into contact with the workers. I would hold that plaintiff has presented a genuine issue of material fact as to whether defendants engaged in intentional conduct which they knew was substantially certain to result in serious injury or death.

I reject the majority's suggestion that the existence of a safety policy is enough to relieve an employer of knowledge, where there is evidence that the policy was not effective. Employers should not be able to use policies and regulations which they do not effectively enforce on the worksite as a paper shield from liability. I further reject the implication that a worksite must have had a previous fatality or "near miss" before its supervisors can be held to know of the likelihood of serious injury or death. Employees should not have to lose a co-worker before their own safety can be ensured.

For the foregoing reasons, I respectfully dissent.