CYNTHIA L. ECHOLS, PLAINTIFF-APPELLANT v. ZARN, INC. AND EDITH BARNETT, DEFENDANTS-APPELLEES

No. 9317SC325

(Filed 20 September 1994)

1. **Workers' Compensation § 69 (NCI4th)— civil action against co-employee—willful, wanton, or reckless conduct required**

     The threshold question in determining whether an employee may maintain a common law action against a co-employee for injuries arising out of and in the course of the employee's employment is whether the co-employee's injurious conduct was willful, wanton, or reckless. This standard requires conduct that manifests a reckless disregard for the rights and safety of others with an element of willfulness, either the. intentional failure to carry out a duty imposed by law or contract that is necessary to the safety of the person or property to whom it is owed, or the intentional committing of the negligent conduct that caused the injury.

     **Am Jur 2d, Workers' Compensation §§ 100, 101.**

     **What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

     **Willful, wanton, or reckless conduct of co-employee as ground of liability despite bar of workers' compensation law. 57 ALR4th 888.**

2. **Workers' Compensation § 69 (NCI4th)— civil action against co-employee—summary judgment for co-employee proper**

     The trial court properly granted summary judgment for defendant co-employee in plaintiff's action to recover for injuries to her hand sustained when she reached under a safety gate into a molding machine allegedly at the instruction of defendant supervisor, since the actions of defendant failed to rise to the level of willful conduct necessary to maintain a civil action against her, especially in light of the undisputed evidence that defendant worked the machine herself by reaching under the safety gate; defendant did not tell plaintiff to put her hand in the mold area; in fifteen years of reaching under the gate no employee had ever been injured; and reaching under the safety gate

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

to pull a molded part down by the tail of the product or by the product was considered acceptable by defendant employer.

**Am Jur 2d, Workers' Compensation §§ 100, 101.**

**What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

**Willful, wanton, or reckless conduct of co-employee as ground of liability despite bar of workers' compensation law. 57 ALR4th 888.**

3. **Workers' Compensation § 62 (NCI4th)— employer not intentionally engaged in injurious conduct—no civil action by employee against employer**

Plaintiff could not maintain a civil action against her employer for injuries arising out of and in the course of her employment because the evidence was insufficient to show that defendant intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death where defendant had a safety rule which allowed only mechanics and maintenance personnel to bypass safety guards when working on equipment; defendant knew of the practice of supervisors training employees to reach under the safety gate to retrieve products which had fallen out of the mold; plaintiff's supervisor told plaintiff to reach under the safety gate to pull the part out; reaching below the safety gate was not considered a violation of safety rules or unsafe; no one instructed plaintiff to place her hand in the mold area; and machine operators had been reaching under the gate for fifteen years without injury.

**Am Jur 2d, Workers' Compensation §§ 75 et seq.**

**What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

Judge GREENE concurring in part and dissenting in part.

Appeal by plaintiff from order entered 26 January 1993 by Judge W. Douglas Albright in Rockingham County Superior Court. Heard in the Court of Appeals 14 January 1994.

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

This action arises out of an accident in which plaintiff, Cynthia Echols, received serious injury when her hand was caught in a molding machine that she was operating as an employee of Defendant Zarn, Inc. As operator of the molding machine, plaintiff was required to remove plastic parts from the machine. The injury occurred when plaintiff reached under the safety gate of the molding machine to remove a plastic part and the molding machine closed on and crushed plaintiff's right hand.

On 23 January 1992, plaintiff filed her complaint against Zarn, Inc. and a co-employee, Edith Barnett, in Rockingham County Superior Court. In her complaint, plaintiff alleged that Defendant Edith Barnett, a supervisory employee of Zarn, Inc., directed plaintiff to remove the plastic parts from the molding machine by reaching under the safety gate and that Zarn, Inc. knowingly allowed its employees to use the molding machine without the necessary guarding and safety device. Further, plaintiff alleged that these acts of defendants constituted "willful, reckless and wanton" conduct which directly and proximately caused plaintiff's injuries. Defendants filed an answer denying plaintiff's allegations of willful, reckless and wanton conduct, and in January 1993, defendants filed a motion for summary judgment.

On 26 January 1993, Judge W. Douglas Albright entered an order granting defendants' motion for summary judgment. From this order, plaintiff appeals.

*Patterson, Harkavy & Lawrence, by Donnell Van Noppen III, Melinda Lawrence and Maxine Eichner, for plaintiff-appellant.*

*Womble Carlyle Sandridge & Rice, by Reid C. Adams, Jr. and James P. Hutcherson, for defendant-appellees.*

ORR, Judge.

The sole issue on appeal is whether the trial court erred in granting defendants' motion for summary judgment. Defendants contend that the trial court properly granted summary judgment in their favor because plaintiff's sole remedy for this cause of action is found in the Workers' Compensation Act. Plaintiff contends, on the other hand, that she may maintain this action against her co-employee, Edith Barnett, pursuant to the holding in *Pleasant v. Johnson,* 312 N.C. 710, 325 S.E.2d 244 (1985) and against her employer, Zarn, Inc., pursuant to the holding in *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222 (1991).

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

For the reasons stated below, we conclude that the plaintiff may not maintain her action against her co-employee, Edith Barnett, or her employer, Zarn, Inc., and that the trial court properly granted defendants' motion for summary judgment.

At the outset, we note our standard of review for summary judgment. Summary judgment is the device whereby judgment is rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c). "Summary judgment is proper when it appears that even if the facts as claimed by plaintiff are taken as true, there can be no recovery." *Hudson v. All Star Mills, Inc.*, 68 N.C. App. 447, 450, 315 S.E.2d 514, 516, *disc. review denied*, 311 N.C. 755, 321 S.E.2d 134 (1984). " 'In ruling on a motion for summary judgment the evidence is viewed in the light most favorable to the non-moving party.' " *Martin Marietta Corp. v. Wake Stone Corp.*, 111 N.C. App. 269, 276, 432 S.E.2d 428, 433 (1993), *disc. review denied*, 335 N.C. 770, 442 S.E.2d 517, *motion to dismiss appeal denied*, 335 N.C. 770, 442 S.E.2d 517 (1994) (citation omitted).

In the present case, the undisputed evidence shows that Defendant Edith Barnett was a supervisory employee of Defendant Zarn, Inc. On the date of the accident, Barnett assigned plaintiff to operate a S-2 molding machine, which operation included removing plastic parts as they were produced by the machine. The molding machine was equipped with a safety gate, and when the gate was opened by the operator, the machine would shut off, thereby preventing the mold from closing. When the safety gate was closed, the machine would not shut off.

Plaintiff testified in her deposition that on the day of the accident, Barnett sent her to work on the S-2 molding machine to relieve another employee named Geraldine. When plaintiff arrived, Geraldine was still working at the machine. Plaintiff told Geraldine that she did not know how to run the machine, and Geraldine told her to open the safety gate and take the parts out. Plaintiff testified:

> I kept telling Geraldine I didn't know how to run the machine. And she was trying to tell me how to do it. And I just couldn't comprehend it, you know. I just couldn't do it. And Edith [Barnett] come [sic] up. And there was [sic] parts everywhere because I would take them out, but I couldn't—you know, I couldn't do it as fast as everybody else could do it.

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

Plaintiff testified that when Barnett came over to the machine she told Geraldine that if she did not leave, she would be put back to work. Geraldine left, and Barnett started showing plaintiff how to work the machine. Plaintiff testified that Barnett removed the parts by opening the safety gate and then she let plaintiff work the machine. Plaintiff testified that she had trouble getting the part out of the machine and that parts were backing up. Plaintiff testified that she told Barnett that she did not know how to work the machine but that Barnett told her that she was going to learn how to work the machine.

Plaintiff testified that Barnett started running the machine again to show plaintiff how to work it. Plaintiff further testified that Barnett told plaintiff "there would be a quick and easy way if [plaintiff] stuck [her] hand under the gate and pulled the part out." Barnett then showed plaintiff how to reach underneath the safety gate and remove the parts. In her affidavit, plaintiff testified that "[i]n demonstrating how she operated the machine and instructing how [plaintiff] was to operate it, Ms. Barnett reached under the gate and appeared to reach into the area of the mold to pull the part from the machine."

Plaintiff further testified in her deposition that after showing plaintiff how to reach under the safety gate, Barnett "told [plaintiff] to reach up under the [safety] gate and pull the part out . . . ." Plaintiff testified that the "main reason" she reached under the safety gate pursuant to Barnett's instruction was because plaintiff was "afraid of losing [her] job . . . ." Plaintiff testified that the first time she tried to reach under the safety gate, the machine caught and smashed her hand.

Barnett testified, on the other hand, that she told plaintiff that she could reach under the gate and grab the excess "flashing" or "tail" of the part to pull it out of the machine. When asked how she showed plaintiff to operate the machine on the day of the injury, Barnett stated that she started off opening the safety gate to pull the molded part out but that on about the third or fourth time she began reaching under the safety gate because the parts were falling out of the mold. Barnett testified, "Reaching under [the safety gate] was easier for me because the gate was heavy[,] and I have always done it that way."

Barnett testified that she showed plaintiff how to open the safety gate and that she also showed plaintiff the way she removed parts by reaching under the gate and said, "this is the way I do it, . . . you can do whichever way you want." Barnett testified that she did not tell

**ECHOLS v. ZARN, INC.**

[116 N.C. App. 364 (1994)]

plaintiff to reach under the safety gate. Further, Barnett testified that at no time did she tell plaintiff to operate the machine and that at the time of the injury, Barnett thought that plaintiff was cutting one of the parts Barnett had laid on the table. Barnett heard plaintiff scream and did not remember anything after that point.

Additionally, the Vice President of Human Resources for Zarn, Linda Marlowe, who was the head of Zarn's safety committee in 1989, also testified in a deposition. When asked whether Zarn had safety rules regarding bypassing the safety mechanisms, Marlowe read one of Zarn's safety rules into her deposition which rule states:

"Never place hands into any moving machine unless all safety devices are operating properly and it is safe to do so. Only authorized mechanics and maintenance personnel may reach around or otherwise bypass a safety guard when working on machinery or equipment."

Further, when asked whether it would be a violation of Zarn's safety rules to bypass guards or gates Marlowe answered:

A. It would be a violation of this rule that I just stated. However, reaching down and—at the bottom of the gate to pull out something by a tail or by the product—pulling the product out—was not considered a violation. It was—The gate was there to protect someone from getting injured from the mold or the pinch off part. So it was not ever considered that down below that gate—reaching under there—was a violation or that it was unsafe.

Further, Marlowe testified that when the tail of the part had come out of the mold, it was not a violation of the safety rules to reach under the machine to pull the part out because the employee would not be putting her hand into a hazardous area in that case. Marlowe also testified, however, that reaching into the mold would be a violation of Zarn's safety rules, as would instructing an employee to reach into a mold because putting your hand into a mold would be placing it into a hazardous area.

Edgar French, the Plant Superintendent for Zarn, testified as to the purpose of the safety gate on the S-2 machine. French testified that the purpose of the safety gate was to prevent people from walking into the molds and to stop the machines if the product needed to be run on a "non-automatic" cycle. French testified that an automatic cycle is where the safety gate stays closed, the machine continues to operate automatically, and the parts come out by themselves, and a

non-automatic cycle is where the employee opens the safety gate, which stops the machine, to remove the part. The following testimony is reflected in French's deposition on the issue of what cycle the S-2 machine was on the day plaintiff was injured:

Q. This X-frame that was being manufactured on the S-2 at the time of this injury would be a non-automatic cycle; is that right?

A. Or an automatic if it was falling out and they were pulling it out from under the bottom. It would be an automatic at that point. If they open the gate, it's not automatic. If they keep the gate closed, it's automatic.

Q. Is it automatic if its sort of the operator's option, as you've described? . . .

A. Yes.

. . .

Q. Do you have an understanding, one way or the other, about these X-frames—whether they were dropping completely free down onto the floor and being picked up from under the gate, or whether Ms. Barnett was reaching under the gate and pulling the thing out from the mold?

A. It's my opinion that if she was pulling it out from the bottom, then it was coming out of the mold. So it was just laying there, basically, and you're pulling it out—because if it was hanging in the mold, you couldn't pull it out from underneath the bottom.

Q. Why is that?

A. You just couldn't. I mean, you've got to prize [sic] it out or jerk it out of the mold in [sic] a different angle. . . . If it was hung in the mold, you couldn't pull it from the bottom and pull it out of the mold. There's no way. That's why, at times, this product is automatic or non-automatic. If it's hanging in the mold, you've got to open the door to get it out. If it's fallen free of the molds, then you can pull it out from the bottom.

Additionally, in his affidavit, French testified:

During my entire 22 years with Zarn, our shift supervisors have allowed the operators of the machine in question, and other similar machines, to remove the completed product from the mold by

**ECHOLS v. ZARN, INC.**

[116 N.C. App. 364 (1994)]

reaching under the safety gate. . . . Prior to plaintiff's accident, Zarn had never had an employee injured while removing a completed product from the press mold in question, or from any other machine, by reaching under the safety gate.

Similarly, in her affidavit, Barnett testified that "[m]achine operators at Zarn have been reaching under safety gates on the various machines at Zarn, including the S-2 machine, to remove finished products for over 15 years, and no operator has ever been injured by closing molds or pre-pinch bars while reaching under a safety gate."

## I.

First, we will address whether plaintiff may maintain this action against her co-employee, Edith Barnett. The Workers' Compensation Act bars an employee subject to the Act whose injuries arise out of and in the course of his employment from maintaining a common law action against a co-employee for mere negligent conduct. *Strickland v. King*, 293 N.C. 731, 239 S.E.2d 243 (1977); N.C. Gen. Stat. §§ 97-9, 97-10.1. In *Pleasant*, 312 N.C. 710, 325 S.E.2d 244, however, our Supreme Court determined that the Workers' Compensation Act does not bar an employee from maintaining a common law action against a co-employee for willful, wanton, and reckless negligence.

In *Pleasant*, plaintiff and defendant were co-employees. On 13 May 1980, plaintiff returned from lunch to the work site. As plaintiff was walking across the parking lot he was struck by a truck driven by defendant, and his right knee was seriously injured. Plaintiff sued defendant in a civil action alleging defendant's actions were willful, reckless, and wanton in that he operated the motor vehicle in an attempt to see how close he could operate the vehicle to the plaintiff. At trial, defendant testified that he "intended to scare the plaintiff by blowing the horn and by operating the truck close to him." *Id.* at 711, 325 S.E.2d at 246.

Subsequently, defendant moved for a directed verdict, which motion the trial court granted. Plaintiff appealed, and this Court affirmed by a divided panel. On appeal, the Supreme Court held "that the North Carolina Workers' Compensation Act does not insulate a co-employee from the effects of his willful, wanton and reckless negligence." *Id.* at 717, 325 S.E.2d at 250. Based on this holding, the Court in *Pleasant* concluded, "[s]ince the plaintiff's complaint did allege that the defendant had been willfully, wantonly and recklessly negli-

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

gent, the decision of the Court of Appeals affirming a directed verdict in favor of the defendant is reversed." *Id.* at 718, 325 S.E.2d at 250.

[1] The threshold question in determining whether an employee may maintain a common law action against a co-employee for injuries arising out of and in the course of the employee's employment is, therefore, whether the co-employee's injurious conduct was willful, wanton and reckless. Thus, in the present case we must first determine whether the summary judgment evidence viewed in the light most favorable to plaintiff shows that Barnett's alleged actions constituted willful, wanton, and reckless negligence. Before making this determination, we must look to prior law in order to define what conduct constitutes willful, wanton, and reckless negligence.

In *Pleasant*, our Supreme Court defined " 'wanton' conduct as an act manifesting a reckless disregard for the rights and safety of others" and defined "reckless" as a synonym for "wanton" when used in this context. *Id.* at 714, 325 S.E.2d at 248 (citations omitted). As for "willful negligence" the Court stated:

> Defining "willful negligence" has been more difficult. At first glance the phrase appears to be a contradiction in terms. The term "willful negligence" has been defined as the intentional failure to carry out some duty imposed by law or contract which is necessary to the safety of the person or property to which it is owed. . . . A breach of duty may be willful while the resulting injury is still negligent. Only when the injury is intentional does the concept of negligence cease to play a part. . . . We have noted the distinction between the willfulness which refers to a breach of duty and the willfulness which refers to the injury. In the former only the negligence is willful, while in the latter the injury is intentional.

> Even in cases involving "willful injury," however, the intent to inflict injury need not be actual. Constructive intent to injure may also provide the mental state necessary for an intentional tort. . . . Constructive intent to injure exists where conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in spirit to actual intent is justified. . . . Wanton and reckless negligence gives rise to constructive intent.

*Id.* at 714-15, 325 S.E.2d at 248 (citations omitted).

## ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

In *Dunleavy v. Yates Construction Co.*, 106 N.C. App. 146, 416 S.E.2d 193, *disc. review denied*, 332 N.C. 343, 421 S.E.2d 146 (1992), this Court applied the willful, wanton, and reckless standard to determine whether an employee could maintain a civil action against a co-employee for injuries arising out of and in the course of the employee's employment. In *Dunleavy*, plaintiffs' intestate, Johnny Glenn Cobb, II ("Cobb") was a member of an inexperienced pipe crew that was employed by Yates Construction Company, an independent contractor. Yates Construction Company was hired by Springfield Properties to construct, among other things, sewer lines. On 18 October 1985, the pipe crew, of which Cobb was a member, began digging the first leg of the trench work at the construction site while Donald Baynes, the crew foreman, was present.

During the afternoon, the crew began digging the second leg of the trench work when Baynes was called away to another part of the work site.

At this point, the trench had not exceeded five feet in depth and was not to exceed five feet during the second leg of the work, and no one in the crew was working in any part of the trench that exceeded a depth of five feet. While Baynes was gone, however, the backhoe operator made more progress than had been expected and began digging the trench deeper than five feet. Some time later, Cobb was killed when a small portion of the trench where the depth exceeded five feet collapsed.

*Id.* at 155-56, 416 S.E.2d at 198-99. Plaintiffs' intestate filed a complaint against Baynes, Yates Construction Company, Springfield Properties, and two other defendants associated with Yates Construction Company, alleging "that Cobb's death was the result of a deliberate and intentional assault and willful, wanton, and reckless negligence." *Id.* at 150, 416 S.E.2d at 195.

As to Defendant Baynes, the trial court granted Baynes' motion for summary judgment, which action this Court affirmed in an unpublished opinion. Subsequently, after our Supreme Court filed *Woodson*, 329 N.C. 330, 407 S.E.2d 222 (1991) (discussed in the second portion of this opinion), the Court allowed plaintiffs' petition for discretionary review " 'for the limited purpose of entering the following order: the case is remanded to the Court of Appeals for reconsideration in light of' " *Woodson. Dunleavy*, 106 N.C. App. at 151, 416 S.E.2d at 196.

Upon reconsideration, this Court applied the "willful, wanton, and reckless negligence" standard of *Pleasant* to determine whether plaintiffs' intestate could maintain the action against Baynes, Cobb's co-employee. This Court reviewed the evidence and concluded that it showed "that Baynes' conduct, although arguably negligent, was not willful, wanton, and reckless." *Dunleavy*, 106 N.C. App. at 156, 416 S.E.2d at 199. Further, this Court concluded that "Baynes' conduct did not manifest reckless disregard for the rights and safety of the pipe crew, nor did it amount to the intentional failure to carry out a duty of care owed to the crew." *Id.* Based on these conclusions, this Court held that the trial court did not err in granting Baynes' motion for summary judgment.

In *Pendergrass v. Card Care, Inc.*, 333 N.C. 233, 424 S.E.2d 391 (1993), our Supreme Court again applied the willful, wanton, and reckless standard outlined in *Pleasant* to another common law action brought by an employee against a co-employee for injuries arising out of the employee's employment. In *Pendergrass*, plaintiff, Donald Pendergrass, was injured when his arm was caught in a final inspection machine that he was operating as an employee of Texfi. Plaintiff filed a common law action against his employer and two co-employees. He alleged the co-employees were grossly and wantonly negligent in that they directed him "to work at the final inspection machine when they knew that certain dangerous parts of the machine were unguarded, in violation of OSHA regulations and industry standards." *Pendergrass*, 333 N.C. at 238, 424 S.E.2d at 394. The co-employees filed a motion to dismiss the action, which motion the trial court granted. Plaintiff appealed to this Court, and we affirmed the order of the trial court dismissing plaintiff's complaint against his co-employees. The Supreme Court granted plaintiff's application for discretionary review.

In determining whether plaintiff could maintain his action against the co-employees, our Supreme Court stated:

In *Pleasant*, we defined willful, wanton and reckless negligence, which will support a claim independently of the Workers' Compensation Act. . . . In defining such negligence, we said a constructive intent to injure may be inferred when the conduct of the defendant is manifestly indifferent to the consequences of the act. . . .

The negligence alleged as to [the co-employees] [did] not rise to the level of the negligence in *Pleasant*. Although they may have

known certain dangerous parts of the machine were unguarded when they instructed Mr. Pendergrass to work at the machine, we do not believe this supports an inference that they intended that Mr. Pendergrass be injured or that they were manifestly indifferent to the consequences of his doing so.

*Id.* Based on these conclusions, the Court held that the motion to dismiss was properly allowed as to plaintiff's co-employees.

Our review of these cases shows that the willful, wanton and reckless standard requires conduct that manifests a reckless disregard for the rights and safety of others with an element of willfulness. The willfulness standard does not require, however, that the acts be committed with the intent to *injure*, but it does appear to require some sort of intent, whether it is the intentional failure to carry out a duty imposed by law or contract that is necessary to the safety of the person or property to whom it is owed or it is the intentional committing of the negligent conduct that caused the injury.

Constructive intent can also be used to show willfulness. Constructive intent arises when the conduct that threatens the safety of others is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness, equivalent in spirit to actual intent, is justified.

[2] With these standards in mind, we now address plaintiff's claim against her co-employee, Edith Barnett. The evidence viewed in the light most favorable to plaintiff in support of plaintiff's contention that Barnett's conduct was willful, wanton, and reckless is as follows: Barnett was a supervisory employee over plaintiff who was familiar with the S-2 machine and knew of the tremendous force exerted by the machine. Further, Barnett knew plaintiff was unfamiliar with the S-2 machine and that plaintiff was also unfamiliar with the manual removal of the products from the machine. In addition, Barnett was in charge of enforcing Zarn's safety rules, and at the time of the accident, Zarn had a safety rule which stated:

"Never place hands into any moving machine unless all safety devices are operating properly and it is safe to do so. Only authorized mechanics and maintenance personnel may reach around or otherwise bypass a safety guard when working on machinery or equipment."

Even with this knowledge, plaintiff testified that Barnett "told [her] to reach up under the [safety] gate and pull the part out . . . ." Plaintiff

also testified that when Barnett demonstrated how to reach underneath the safety gate to remove the parts, "Ms. Barnett reached under the gate and appeared to reach into the area of the mold to pull the part from the machine."

However, if the actions of the co-employees in *Pendergrass* who instructed an employee to work on an unguarded, dangerous machine, did not rise to the level of negligence necessary to maintain a civil action against the co-employees as defined under *Pleasant*, the actions of Barnett alleged in the present action also fail to rise to the level of negligence necessary to maintain a civil action against her. Even if we assume that Barnett knew that reaching under the safety gate could be dangerous, we do not believe this supports an inference that Barnett intended that plaintiff be injured or that she was manifestly indifferent to the consequences of plaintiff reaching under the safety gate. This is true, especially in light of the undisputed evidence that Barnett worked the machine herself by reaching under the safety gate and that, although machine operators had been reaching under the safety gates at Zarn to operate machines, in over fifteen years, no operator had ever been injured by closing molds or pre-pinch bars while reaching under a safety gate.

Thus, the fundamental problem with this case lies with the instructions and demonstration given by Barnett to plaintiff in reaching beneath the safety gate. The exhibits in this case reflect that the S-2 machine is a sizable machine with a large frontal gate that makes visibility behind the machine virtually impossible. The bottom edge of the gate appears to be approximately four inches below the bottom edge of the mold. The testimony reflects that when the safety gate is closed, the plastic X-frame is released from the mold after being molded and drops down from the machine but may occasionally still be attached by flashing to the mold.

The undisputed testimony given by Zarn's Vice President of Human Resources was that "[t]he [safety] gate was there to protect someone from getting injured from the mold or the pinch off part. So it was not ever considered that down below that gate—reaching under there—was a violation [of Zarn's safety rules] or that it was unsafe." Further, the Vice President testified, "reaching down . . . at the bottom of the [safety] gate—to pull out something by a tail or by the product—pulling the product out [of the machine] was not considered a violation" of Zarn's safety rules. Thus, according to the tes-

timony, reaching under the gate to pull the part down by the tail of the product or by the product, was considered acceptable.

Even under the most favorable reading of plaintiff's testimony, no one ever encouraged her to reach into the mold area, but at most, while demonstrating the machine's use, Barnett "appeared to reach into the area of the mold to pull the part from the machine." Although such a flawed demonstration or request that plaintiff "reach up under the [safety] gate and pull the part out" might well be negligent, it does not rise to the level of conduct necessary to create personal liability over and above the Workers' Compensation Act. Accordingly, we conclude that the trial court did not err in granting Barnett's motion for summary judgment.

## II.

[3] Next, we will address whether plaintiff may maintain this action against her employer, Zarn, Inc. In addition to the prohibition of civil actions against negligent co-employees, the Workers' Compensation Act also bars an employee subject to the Act from maintaining a common law negligence action against his employer. *Pleasant*, 312 N.C. at 713, 325 S.E.2d at 247. In *Woodson*, 329 N.C. at 340-41, 407 S.E.2d at 228, however, our Supreme Court recognized that an employee may maintain a civil action against his employer when the employer "intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct . . . ."

Thus, the question we must answer in addressing whether plaintiff may maintain this action against her employer, Zarn, Inc., is whether the evidence, viewed in the light most favorable to plaintiff, would tend to show that Zarn intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death to employees and plaintiff was injured by that misconduct.

The "substantial certainty" threshold for civil recovery against employers is higher than the "willful, wanton and reckless" threshold for civil recovery against co-employees. *Id.* at 342, 407 S.E.2d at 229. "The conduct must be so egregious as to be tantamount to an intentional tort." *Pendergrass*, 333 N.C. at 239, 424 S.E.2d at 395.

This Court recently addressed the issue of what constitutes a "substantial certainty" in *Powell v. S & G Prestress Co.*, 114 N.C. App. 319, 442 S.E.2d 143 (1994). In *Powell*, Timothy Powell was employed by S & G Prestress Company ("Prestress"), a manufacturer of rein-

forced concrete elements used in the construction of bridges and foundations, as a temporary employee. "Temporary employees were provided with hardhats and safety glasses but were not given any safety training. Prestress did not provide temporary employees with its safety manual." *Id.* at 321, 442 S.E.2d at 144.

On 29 November 1989, Powell was a member of an eight-person crew working on one of two forming beds used to construct concrete elements. "His job was to attach reinforcing bars to the forming beds before the concrete was poured. The two forming beds [ran] parallel to one another, and an overhead crane straddle[d] the forming beds." *Id.* Subsequently, on this date, the crane moved backward, past Powell, to pick up a tarp and began moving forward at full speed toward him. "Powell's left foot was caught under the wheel, and before the crane could be stopped, it traveled the length of his body, crushing and killing him." *Id.* at 322, 442 S.E.2d at 145.

Plaintiff's intestate sued Prestress, among other defendants, in superior court for wrongful death to recover damages. Prestress moved for summary judgment, which motion the trial court granted. Plaintiff appealed to this Court. On appeal, this Court stated, "[t]he question for our determination is whether the forecast of evidence is sufficient to show that Prestress intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death" pursuant to *Woodson. Powell*, 114 N.C. App. at 324, 442 S.E.2d at 146. On this issue, this Court stated:

> The misconduct which satisfies the substantial certainty standard is best demonstrated by the following illustration . . . .

> A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that this act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

*Id.* at 325, 442 S.E.2d at 147 (citation omitted). Further, "[s]ubstantial certainty requires more than a mere possibility or substantial probability of serious injury or death." *Id.* In light of these rules, this Court concluded:

> The forecast of evidence in this case persuades us that Prestress did not engage in misconduct *knowing* it was substantially certain to cause serious death or injury. All the evidence showed that Prestress' policy was that the straddle crane was not to be

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

operated without a signal man and that, at the time of Powell's death, this policy was being enforced. Plaintiff presented no evidence that Prestress had a policy to allow cranes to be moved without a signal man. Unlike the employer in *Woodson*, Prestress did not permit work to go on without an arrangement to carry out a policy designed to protect the safety of its employees. <u>Assuming *arguendo* that a reasonable juror could determine that by permitting employees to work in close proximity to a moving straddle crane, the risk of serious injury or death as a result of contact with a crane was present, then the forecast of evidence is not sufficient to show that these circumstances were substantially certain to cause Powell's injury and death. No employees of Prestress had been struck by a crane in the past.</u> Prestress' past violations involving crane operation do not concern the hazards of operating a crane in close proximity to workers. There were no safety regulations which required Prestress to use tire guards or keep its employees a certain distance from moving cranes.

*Id.* at 325-26, 442 S.E.2d at 147 (emphasis by underline added).

Based on these conclusions, this Court held:

The circumstances of Powell's death demonstrate that Prestress could have taken further steps to ensure the safety of its employees who worked in close proximity to straddle cranes, but the forecast of evidence is not sufficient to show that there exists a genuine issue of material fact regarding whether Prestress engaged in misconduct knowing it was substantially certain to cause serious injury or death. Summary judgment in favor of Prestress must therefore be affirmed.

*Id.* at 326, 442 S.E.2d at 147.

In the present case, plaintiff's evidence in its most favorable light tends to show that Zarn adopted the safety rule that "[o]nly authorized mechanics and maintenance personnel may reach around or otherwise bypass a safety guard when working on machinery or equipment" and that Zarn knew of the practice of supervisors training employees to reach under the safety gate to retrieve the products that had fallen out of the mold. Plaintiff's evidence viewed in its most favorable light also tends to show that the S-2 machine had no visible or audible signals to warn of the impending closing of the mold plates and that Barnett, acting for Zarn, specifically told plaintiff "to reach up under the [safety] gate and pull the part out" when she knew plain-

tiff had never operated the S-2 machine for the particular product they were making on the day of the injury.

The undisputed evidence also shows, however, that the safety gate was in place to protect workers from the mold and pinch off mechanism that were positioned above the safety gate and that reaching below the safety gate to retrieve a part was not considered a violation of Zarn's safety rules or unsafe. Additionally, there is no evidence that shows that anyone employed by Zarn directed plaintiff to place her hand into the mold area. At best the demonstration given by Barnett to show plaintiff how to retrieve the X-frame from under the safety gate was unclear.

Further, although the evidence shows that the S-2 machine had no visible or audible signals to warn of the impending closing of the mold plates, like in *Powell*, there were no regulations requiring Zarn to have such signals. Finally, machine operators at Zarn had been reaching under safety gates on the various machines, including the S-2 machine, to remove finished products for over 15 years, and, like in *Powell*, there was evidence that no operator had ever been injured by closing molds or pre-pinch bars while reaching under a safety gate.

Thus, we conclude that as in *Powell*, the forecast of evidence in this case is not sufficient to show that Zarn intentionally engaged in misconduct knowing it was substantially certain to cause serious injury or death. Although the circumstances surrounding plaintiff's injury show that Zarn could have taken further steps to ensure the safety of its employees working on the S-2 machine, we do not find that Zarn's conduct was so "egregious" as to be tantamount to an intentional tort.

Accordingly, we affirm the order of the trial court granting defendants' motion for summary judgment as to Zarn.

Affirmed.

Judge COZORT concurs.

Judge GREENE concurs in part and dissents in part.

Judge GREENE concurring in part and dissenting in part.

For the reasons given by the majority, I agree that summary judgment for Zarn must be affirmed. I do not agree, however, that summary judgment for Barnett is appropriate.

ECHOLS v. ZARN, INC.

[116 N.C. App. 364 (1994)]

As a fellow employee, Barnett is liable for injuries sustained by plaintiff if those injuries are proximately caused by Barnett's conduct and if the conduct "threatens the safety" of the plaintiff and is "reckless or manifestly indifferent to [its] consequences." *Pleasant v. Johnson*, 312 N.C. 710, 715, 325 S.E.2d 244, 248 (1985). I believe the evidence presented at the summary judgment hearing, when considered in the light most favorable to the plaintiff, presents a genuine issue of fact with regard to whether Barnett's conduct threatened the safety of plaintiff and was manifestly indifferent to the consequences.

The evidence, in the light most favorable to the plaintiff, reveals that Barnett, while demonstrating to the plaintiff the proper use of the machine, "reached under the gate and appeared to reach *into the area of the mold*[1] to pull the part from the machine [emphasis added]." The evidence of Barnett is that although she told plaintiff she could reach under the safety gate and "grab the excess flashing . . . to pull it out of the machine," she never instructed plaintiff to reach *into the area of the mold*. There thus exists a factual dispute as to the instructions Barnett gave to the plaintiff. If the instructions were as contended by plaintiff, they threatened her safety and were manifestly indifferent to the likelihood of harm to her. This is so because there is no dispute in the evidence that the mold of the machine regularly opened and closed and that a hand caught in the mold would be seriously injured. In this case, plaintiff's hand was caught in the mold and seriously injured.

For the reasons given, I would reverse the entry of summary judgment for Barnett and remand for trial.

---

1. Because the mold is located behind the safety gate, which is closed during the operation of the machine, the mold was not visible to plaintiff when Barnett instructed plaintiff on the use of the machine.