DEBORAH ROBERTSON MICKLES, Individually, and as the Administratrix of the Estate of Fred David Mickles, Plaintiff v. DUKE POWER COMPANY, KLEIN TOOLS, INC., AND BUCKINGHAM MANUFACTURING, INC., Defendants

No. 9321SC762

(Filed 2 August 1994)

**Workers' Compensation § 62 (NCI4th)— workplace death— employer's misconduct—substantial certainty of causing injury or death—lineman's use of faulty, incompatible, or insufficient equipment—sufficiency of evidence**

The trial court erred in granting summary judgment for defendant employer in this case involving a workplace death where a jury could conclude that defendant's act of sending a lineman up an electrical tower with faulty or incompatible safety equipment was substantially certain to result in the death of a lineman, based on the number of falls over the years experienced

by Duke Power lineman, as well as the heights at which linemen work and the absolute certainty of serious injury or death resulting from a fall; and a jury could conclude that defendant knew with substantial certainty that its continued use of only body-belts and pole straps as safety equipment, as opposed to alternative apparatus or fall arrest measures, would inevitably result in death or serious bodily injury.

**Am Jur 2d, Workers' Compensation §§ 75-87.**

**What conduct is willful, intentional, or deliberate within workmen's compensation act provision authorizing tort action for such conduct. 96 ALR3d 1064.**

Appeal by plaintiff from order filed 4 June 1993 by Judge Thomas W. Ross in Forsyth County Superior Court. Heard in the Court of Appeals 13 April 1993.

*Robinson Maready Lawing & Comerford, by William F. Maready and Clifford Britt, for plaintiff-appellant.*

*Duke Power Company, by W. Edward Poe, Jr. and Jeff D. Griffith, III; and Adams Kleemeier Hagan Hannah & Fouts, by Daniel W. Fouts, W. Winburne King III and Edward L. Bleynat, Jr., for defendant-appellant Duke Power.*

JOHN, Judge.

In this case involving a workplace death, plaintiff contends the trial court erred by granting defendant Duke Power's motion for summary judgment. We are persuaded that plaintiff is correct.

On 7 August 1991, Fred David Mickles (Mickles), a lineman in the employ of defendant Duke Power Company (Duke Power), was killed when he fell approximately 100 feet from a large electric transmission tower. At that time, Mickles was secured to the tower by a "body belt" and a "pole strap," but had no back-up safety device.

Mickles' body belt, manufactured by defendant Klein Tools Inc. (Klein), was fastened around his waist and had two steel "D-rings," one on each side. The pole strap, manufactured by defendant Buckingham Manufacturing, Inc. (Buckingham), was wrapped around a ladder and equipped with a metal safety hook on each end. These hooks attach to the body belt's D-rings and are known as "safety snaps" because there is a spring loaded snap on each hook to prevent

the D-ring from escaping. Immediately before Mickles' fall, the safety snaps were attached to the D-rings of his body belt.

Mickles fell as the result of "roll-out," the disengagement of a safety snap from the body belt. Roll-out occurs when a safety snap becomes positioned such that the D-ring's outer edge forces open the hook's spring-loaded snap. At the time of Mickles' death, roll-out had been a recognized industry hazard for over ten (10) years.

Plaintiff, Mickles' widow and administratrix, brought this action seeking damages in her representative capacity as well as for loss of consortium. Plaintiff alleged Duke Power was willfully and wantonly negligent in providing equipment to Mickles which Duke Power knew was substantially certain to result in death or serious bodily injury. Plaintiff further alleged all three defendants (1) were strictly liable and (2) had breached implied warranties.

On 25 March 1993, plaintiff voluntarily dismissed her claims against defendant Klein. Likewise, on 30 June 1993, she dismissed her claims against defendant Buckingham. Duke Power, the remaining defendant, moved for summary judgment. After considering the pleadings, affidavits, discovery, and arguments of the parties, the trial court granted Duke Power's motion.

---

The question before us is whether the trial court properly allowed Duke Power's motion for summary judgment. Summary judgment is appropriate only when there exists no genuine issue of material fact and the undisputed facts establish that a party is entitled to judgment as a matter of law. N.C.R. Civ. P. 56(c). Duke Power, as the party moving for summary judgment, has the burden of establishing the lack of any triable issue. *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 62-63, 414 S.E.2d 339, 341-42 (1992). The movant may meet its burden by showing: (1) an essential element of plaintiff's claim is nonexistent; (2) discovery indicates plaintiff cannot produce evidence to support an essential element; or (3) plaintiff cannot surmount an affirmative defense. *Roumillat*, 331 N.C. at 63, 414 S.E.2d at 342. Because plaintiff is the non-moving party, all the evidence must be considered in the light most favorable to her and all inferences of fact must be drawn in her favor. *Id.*

In the case *sub judice*, Duke Power argues the evidence fails to support any of plaintiff's claims for relief. According to Duke Power, the Worker's Compensation Act, N.C.G.S. § 97-1 to -101 (1991) (the Act), provides the exclusive remedy for plaintiff's injuries. *See* G.S.

**MICKLES v. DUKE POWER CO.**

[115 N.C. App. 624 (1994)]

§§ 97-9 and -10.1 (if plaintiff is attempting to recover from his employer or a co-worker for injuries suffered in a workplace "accident," the Act provides an exclusive remedy); *see also Hicks v. Guilford County*, 267 N.C. 364, 148 S.E.2d 240 (1966). Plaintiff, however, responds that the exclusivity provisions of the Act are inapplicable because this case falls within the common-law exception enunciated in *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991).

*Woodson* was a wrongful death action wherein the plaintiff's decedent, a sewer worker, died when a ditch caved in on him. The facts of *Woodson* indicated substantial negligence on the part of the decedent's employer, a sub-contractor: the employer had been cited four times in the previous six and a half years for violation of trenching regulations; the trench which collapsed was too deep and was not properly sloped, shored, or braced; a safety device (a trench box) was available but not utilized; the general contractor had refused to let its employees work in the dangerous ditch; and the employer had ordered his workers into the trench and was supervising the job at the time of the accident. Under these circumstances, the Supreme Court concluded that the exclusivity provisions of the Workers' Compensation Act were not a bar. According to the Court:

> *[W]hen an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct*, that employee, or the personal representative of the estate in case of death, may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act.

*Woodson*, 329 N.C. at 340-41, 407 S.E.2d at 228 (emphasis added).

Misconduct which satisfies *Woodson's* "substantial certainty" standard is further illustrated by the following example from the Restatement (Second) of Torts:

> A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

Restatement (Second) of Torts § 8A illus. 1 (1965) (quoted as an illustration of "substantial certainty" in *Powell v. S & G Prentress Co.*, 114

N.C. App. 319, 325, 442 S.E.2d 143, 147 (1994)). As the Restatement example and the facts of *Woodson* indicate, "substantial certainty" requires more than the mere possibility or substantial probability of serious injury or death. *Woodson*, 329 N.C. at 345, 407 S.E.2d at 231; *see also Powell*, 114 N.C. App. at 325, 442 S.E.2d at 147. Moreover, as *Woodson* and its progeny make clear, the validity of a *Woodson* claim does not rest on the presence or absence of any particular factor; instead, all the facts, as indicated by the evidence, must be considered in order to determine whether the "substantial certainty" standard has been satisfied.

In the case *sub judice*, the evidence, taken in the light most favorable to plaintiff, indicates the following: Mickles died as the result of "roll-out," a safety hazard well-recognized in the power industry. Roll-out occurs when a safety snap becomes positioned such that the D-ring's outer edge forces open the hook's spring-loaded snap. This disengagement occurs only when there is a size incompatibility between the D-ring and the safety snap; Duke Power knew this was the cause of roll-out prior to Mickles' death.

At the time of Mickles' fall, co-workers heard a "clicking" sound, the identical noise made as a spring-loaded safety snap locks back into position. A similar sound was heard at the time of two earlier accidents involving Duke Power linemen: a fatal fall in 1975 and one which left a lineman paraplegic in July of 1990. In all three, the only safety device being worn by the linemen was a body-belt and pole strap combination. In the 1990 occurrence, as in the Mickles fall, the injured employee was wearing a body-belt manufactured by Klein and a Buckingham pole strap. It should be noted, however, that the pole strap worn on the 1990 occasion was manufactured in 1984 while that of Mickles was manufactured in 1986.

Duke Power investigative reports from both the 1975 and 1990 incidents indicate that company officials were aware of the danger posed by the possibility of roll-out. The investigating committee which compiled these reports recommended that linemen visually check their safety snaps and D-rings whenever they changed position in order to avoid roll-out. However, the extent to which these warnings were actually implemented is unclear. An OSHA investigation after the Mickles accident disclosed that only some Duke Power linemen received instruction as to inspection of the ring/safety snap connection and many linemen had not seen a roll-out demonstration. The linemen given instruction were advised to be certain there was no

twist in the strap which could cause roll-out and to check the connection whenever slack was introduced into the strap. It does appear, however, that Mickles received these warnings prior to his fall as his initials appear on a copy of the 1990 accident report.

Plaintiff produced evidence indicating the admonitions, even if presented, were insufficient. An expert witness for plaintiff stated in his affidavit that because linemen must frequently shift positions while performing their duties, it was unreasonable to expect them constantly to check pertinent safety equipment connections during the course thereof.

There is also evidence Duke Power officials informed equipment manufacturers of problems with the D-rings and pole straps after both the 1975 and 1990 occurrences. Contact with manufacturers after the 1975 death resulted in redesign of the D-rings. After the July 1990 fall, John Francis (then Duke Power's Manager of Health & Safety Affairs), examined the body-belt and pole strap involved and was able to duplicate roll-out by twisting the pole-strap. He thereafter visited Buckingham (the strap manufacturer) and took part in several tests with the subject equipment as well as other comparable equipment. After meeting with Francis and testing the 1984 Buckingham strap involved in the July 1990 accident, Buckingham discovered that certain straps it manufactured were incompatible with Klein body-belts. Consequently, in October of 1990, Buckingham issued a recall for pole straps manufactured in the years 1982-84. In this notice, Buckingham acknowledged there had been a number of roll-out incidents arising from incompatibility between the Klein and Buckingham equipment. Duke Power complied with this recall notice by removing the designated straps from service.

In a memorandum dated 17 September 1990 (nearly a year before Mickles' death) and directed only to Duke Power's legal department, Francis expressed his opinion that roll-out was caused by a size incompatibility between the D-ring and safety snap. He also observed that body-belt and safety snaps made by different manufacturers might be incompatible. Despite these observations, Francis stated that an additional safety device known as a fall arrest system "may not be the way to go." A fall-arrest system is a safety device which is not triggered until a fall begins. According to Francis' memorandum: (1) this would be the same as telling linemen that roll-out was a "recognized hazard"; and (2) such a position would be in direct conflict with what Duke Power and other utilities had argued during the

MICKLES v. DUKE POWER CO. ·

[115 N.C. App. 624 (1994)]

development of certain OSHA safety regulations. Although Francis considered his memo only "a place to start," he recommended that Duke Power examine belts and straps for mix/match compatibility and visit other companies using fall arrest systems before "seriously developing" any fall arrest system plan. Aside from compliance with the Buckingham recall, however, *there is no evidence that an examination of Duke's inventory for incompatible equipment was ever conducted* nor was any system or regulation implemented to ensure that only compatible belts and straps were used by the company's linemen. Moreover, Devaney Putnam, a Duke Power safety supervisor who ranked below Francis, disagreed with Francis' recommendations, particularly concerning withholding from linemen information about the possibility of additional safety devices. In his deposition, Putnam stated, "I think we need to let people know when there may be a problem and work toward that."

Further evidence showed that prior to Mickles' death, manufacturers of fall protection equipment recommended in catalogs distributed to the industry that body-belts and pole straps not be used for fall protection because of potential compatibility problems between body-belts and pole straps of different manufacturers. In addition, Duke Power officials, including Francis, attended national safety meetings with equipment manufacturers where roll-out was discussed. According to equipment manufacturers, additional safety devices had been on the market for years and Duke Power had been informed of such devices which included: a fall arrest system, a "rope grab" system, a new and redesigned D-ring, and double-locking safety snaps. According to one manufacturing consultant, double-locking safety snaps had been available since 1984 and could be operated safely with one hand by a lineman wearing gloves. Buckingham demonstrated available safety equipment to Duke Power in March of 1991 but was informed by Duke Power that it had no need for a fall arrest system. Buckingham also sent follow up letters to Duke Power after the March 1991 meeting, but Duke Power never responded to Buckingham's offers of assistance.

Despite manufacturers' warnings, Duke Power employed no new safety devices prior to Mickles' fall. Duke Power defended its position by offering evidence it had tried at least one new device (a double locking safety snap) which had been rejected because it could not be fastened with a single, rubber-gloved hand. Consequently, Duke Power felt it would have been dangerous to require these new snaps for high altitude electrical work.

Ironically, on the day of Mickles' death, agents for Duke Power were filming his work crew in order to develop a company safety film. By all accounts, Mickles was an experienced and skilled lineman with approximately twelve years of experience. Scott Price, a Duke Power safety manager who reviewed the film, found no fault with Mickles' technique with the exception that Mickles had secured himself only to a ladder rung. According to Price, linemen were supposed to utilize both the ladder rung and the ladder rail. Securing only to the rung, he continued, increased the likelihood of roll-out since there would be more slack in the pole strap.

After the incident, an OSHA investigation was conducted. The investigator recreated Mickles' fall utilizing the identical body-belt and safety strap with a ladder leaned against a wall. During the recreation, a subject would walk two steps up and then two steps down the ladder, putting slack into the pole strap. Roll-out was achieved nine (9) out of every (10) times. The experiment was duplicated with a pole strap made by a different manufacturer and again roll-out occurred. The investigation further revealed that Duke Power was "very aware" that roll-out could occur, yet instructed "linemen only to 'check their snap hooks and D-rings' (nothing more specific)." Moreover, it was determined that Duke Power knew of additional safety devices on the market but failed to require such devices. The OSHA investigator was highly critical of Duke Power's protracted response to the similar 1975 and 1990 incidents. He interviewed a Duke Power safety official who reported, according to the investigator, that "he would have liked to have required" a better form of protection for linemen, *"but upper management would not support [it]."* The investigator found that Duke Power's only reaction to the 1975 and 1990 accidents—instructing linemen to inspect the safety snap/pole strap connection whenever slack was introduced into the strap—was "unreasonable and ridiculous" since linemen must constantly shift positions in high places, thereby introducing slack into the pole strap. It should be noted, however, that Duke Power's use of a body-belt and pole strap as the sole safety device for linemen was the accepted industry practice at the time Mickles fell.

Although Mickles' strap was manufactured in 1986 and thus not subject to the Buckingham recall, the OSHA investigator determined that the recall should have placed Duke Power on notice to inspect its inventory for potential incompatibility between body-belts and safety snaps, "no matter who made [them]." Duke Power, however, never undertook any such inspection. Based upon the OSHA investigation,

**MICKLES v. DUKE POWER CO.**

[115 N.C. App. 624 (1994)]

it was recommended that Duke Power be cited for "willful serious" violations of 29 CFR 1910.132(a) and 29 CFR 1910.132(c). These Code sections are general safety obligations and are utilized in the absence of a specific industry standard. However, after Duke Power contested the charges, the subsection .132(a) violation was dismissed and the subsection .132(c) violation was reduced to a "serious" violation.

Applying *Woodson's* "substantial certainty" test to all the facts of the case *sub judice*, we determine the forecast of evidence to be sufficient to survive summary judgment. We acknowledge both that: (1) Duke Power's use of a body-belt and pole strap as the sole safety device for linemen was the accepted industry practice, and (2) OSHA did not issue a citation after the similar 1975 accident and there is no evidence of a citation after the 1990 accident. However, as *Woodson* and its progeny demonstrate, the presence or absence of any one factor is not determinative. Instead, the complete preview of the evidence must be examined. We reiterate that because we are reviewing the grant of summary judgment, the evidence presented and all reasonable inferences must be taken in the light most favorable to plaintiff. *Woodson*, 329 N.C. at 344, 407 S.E.2d at 231.

Pursuant to *Woodson*, plaintiff herein was required to present a forecast of evidence indicating that Duke Power had "intentionally engage[d] in misconduct knowing it [was] substantially certain to cause serious injury or death" to its linemen. The report and recommendation of the OSHA investigator constitute some evidence tending to show Duke Power intentionally engaged in misconduct. Intentional misconduct may also be inferred from the 17 September 1990 memorandum of John Francis which reveals that Duke Power understood the danger of incompatibility presented by mixing and matching equipment from different manufacturers. Despite this knowledge, Mickles' death resulted from the mismatch of a Klein body-belt and a Buckingham pole strap—the same manufacturer combination involved in the July 1990 fall (as well as in the fall of a New York lineman, details of which were known to Duke Power). Intentional misconduct is further suggested by evidence of Duke Power's decision not to pursue additional safety equipment even after (1) a Duke Power safety official had requested such equipment and (2) manufacturers informed Duke Power that such devices were available. Indeed, the power company reportedly told one manufacturer that it had no need for additional safety equipment. As opposed to implementing new safety procedures or purchasing new equipment, Duke Power relied upon what the OSHA investigator described

MICKLES v. DUKE POWER CO.

[115 N.C. App. 624 (1994)]

as "unreasonable and ridiculous" warnings to its linemen to check their connections while working. Moreover, there is evidence that even after Duke Power learned of the Buckingham recall (which was due to an incompatibility between a Klein belt and a Buckingham safety snap—the same type of equipment worn by Mickles), Duke Power conducted no internal investigation to discover whether other belt/strap combinations were susceptible to roll-out, nor established any company-wide procedure or regulation to prevent use of incompatible equipment. This failure is particularly noteworthy since experimentation with Mickles' equipment after his death resulted in a 90% occurrence rate of roll-out.

From the number of falls over the years experienced by Duke Power linemen, as well as the heights at which linemen work and the absolute certainty of serious injury or death resulting from a fall, a reasonable juror could determine that Duke Power's act of sending a linemen up an electrical tower with faulty or incompatible safety equipment was "substantially certain" to result in the death of a lineman. Moreover, a jury could conclude from the evidence that Duke Power knew with substantial certainty that its continued use of only body-belts and pole straps as safety equipment, as opposed to alternative apparatus or fall arrest measures, would inevitably result in death or serious bodily injury.

Because plaintiff presented evidence sufficient to send her *Woodson* claim to the jury, we reverse the trial court's order of summary judgment and remand for further proceedings consistent with our opinion. We observe, however, that plaintiff has made no argument concerning either her (1) strict liability or (2) breach of implied warranty claims. Consequently, these claims are deemed abandoned and may not be pursued by plaintiff on remand.

Reversed and remanded.

Judges WELLS and JOHNSON concur.

Judge WELLS concurred prior to 30 June 1994.