DEBORAH ROBERTSON MICKLES, INDIVIDUALLY, AND AS THE ADMINISTRATRIX OF THE ESTATE OF FRED DAVID MICKLES v. DUKE POWER COMPANY, KLEIN TOOLS, INC., AND BUCKINGHAM MANUFACTURING, INC.

No. 433PA94

(Filed 3 November 1995)

**Workers' Compensation § 62 (NCI4th)— fall by power company linemen—roll-out—Woodson claim—insufficient forecast of evidence**

Plaintiff's forecast of evidence was insufficient under the *Woodson* exception to the exclusive remedy provisions of the Workers' Compensation Act to overcome defendant power company's motion for summary judgment in an action to recover for the death of a lineman who fell from an electric transmission tower when one of the safety snap hooks on a pole strap disengaged from a D-ring on his body belt, a phenomenon known as

MICKLES v. DUKE POWER CO.

[342 N.C. 103 (1995)]

"roll-out," where it tended to show that two employees of defendant had previously been injured or killed because of roll-out in 1975 and 1990; defendant had never been cited for an OSHA violation regarding roll-out; roll-out had occurred in testing only when the pole strap became twisted, slack was introduced into the strap, and then pressure was brought to bear upon the snap hook and D-ring connections; decedent and other employees received training in guarding against roll-out and were instructed to check the snap hooks and D-rings for proper alignment before putting weight on the equipment; the equipment defendant provided complied with OSHA regulations and was equipment provided throughout the United States for fall protection; following the 1990 accident, the manufacturer of the safety straps issued a recall of straps made between 1982 and 1984, but the strap used by decedent was manufactured in 1986; although defendant did not examine its remaining inventory for incompatible equipment following the recall, no such examination was statutorily required; between the 1975 and 1990 accidents, defendant's employees worked over eleven million man-hours aloft without a single incident of roll-out; fall-arrest systems were on the market at the time of decedent's death, but evidence was presented that none of the available models was compatible with defendant's employees' equipment; OSHA standards at the time of decedent's death neither required a fall-arrest system nor addressed equipment compatibility; and an expert's opinion that defendant knew that decedent's equipment was absolutely certain to fail using standard work procedures was inherently incredible. The forecast of evidence thus indicates only that defendant was aware of the somewhat remote possibility that decedent's strap would become twisted, slack would be introduced into the strap, and decedent would fail to check the connecting straps and D-rings before leaning against those connections, which falls short of establishing that defendant knew this was substantially certain to occur. Language in Court of Appeals opinions suggesting that the Restatement (Second) of Torts § 8A illus. 1 illustrates the type of conduct required to satisfy the *Woodson* "substantial certainty" test is disavowed.

**Am Jur 2d, Workers' Compensation §§ 80, 593.**

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 115 N.C. App. 624, 446 S.E.2d

**MICKLES v. DUKE POWER CO.**

[342 N.C. 103 (1995)]

369 (1994), reversing an order of summary judgment for defendant entered 31 May 1993 by Ross, J., in Superior Court, Forsyth County, and remanding for further proceedings. Heard in the Supreme Court 11 September 1995.

*Robinson Maready Lawing & Comerford, L.L.P., by William F. Maready and Clifford Britt, for plaintiff-appellee.*

*Duke Power Company, by W. Edward Poe, Jr., and Jeff D. Griffith, III; and Adams Kleemeier Hagan Hannah & Fouts, by Daniel W. Fouts, W. Winburne King III, and Edward L. Bleynat, Jr., for defendant-appellant Duke Power Co.*

WHICHARD, Justice.

On 6 March 1992, plaintiff Deborah Mickles ("plaintiff"), individually and as the administratrix of the estate of her husband, Fred David Mickles ("Mickles"), filed suit against defendant Duke Power Company ("defendant") seeking to recover damages for the on-the-job death of Mickles. Plaintiff has voluntarily dismissed her action against the other two defendants. The complaint alleged that defendant was wilfully and wantonly negligent in: (1) failing to warn and instruct Mickles about the possibility of an equipment failure commonly known as "roll-out"; (2) failing to provide Mickles with back-up safety equipment in the event of such a failure; (3) placing its employees in an ultra-hazardous and dangerous position where an accident resulting in injury or death was substantially certain to occur; and (4) providing equipment to Mickles which defendant knew was substantially certain to fail, thereby causing death or serious injury.

On 26 October 1992, defendant moved for summary judgment, which the trial court granted on 31 May 1993. On plaintiff's appeal, the Court of Appeals reversed. *Mickles v. Duke Power Co.,* 115 N.C. App. 624, 446 S.E.2d 369 (1994). On 2 November 1994, we allowed discretionary review. We now reverse and order the trial court's grant of summary judgment reinstated.

Summary judgment is an appropriate method for disposing of litigation when there is no genuine issue of material fact and the undisputed facts establish that a party is entitled to judgment as a matter of law. N.C.G.S. § 1A-1, Rule 56(c) (1990). Defendant, as the movant, has the burden of establishing that no triable issue of fact exists. *Roumillat v. Simplistic Enterprises, Inc.,* 331 N.C. 57, 62-63, 414 S.E.2d 339, 341-42 (1992). Defendant may meet this burden by show-

ing that an essential element of plaintiff's claim is nonexistent or that discovery indicates that plaintiff cannot produce evidence to support an essential element of her claim. *Id.* at 63, 414 S.E.2d at 342. For purposes of summary judgment, all inferences of fact must be drawn against the movant and in favor of the nonmovant. *Id.*

The forecast of evidence in response to defendant's motion for summary judgment showed the following. Mickles was employed as a lineman by defendant and was killed on 7 August 1991 when he fell 102 feet from an arm of a large electric transmission tower. At the time of the accident, Mickles was secured to a ladder by a body belt manufactured by Klein Tools, Inc. ("Klein"), and a pole strap, or safety strap, manufactured by Buckingham Manufacturing, Inc. ("Buckingham"). The body belt was fastened around Mickles' waist, and the pole strap was wrapped around a rung in the ladder and fastened to two D-rings on either end of the body belt. Mickles fell when one of the safety snaps on the pole strap disengaged from a D-ring on the body belt. This phenomenon is known as "roll-out."

The utility industry has known of roll-out for years, but it is a rare occurrence. On only two other occasions since 1975 have defendant's employees been killed or injured because of roll-out. The first of these incidents occurred in 1975, when Paul Hicks fell 125 feet to his death in the vicinity of Hillsborough. An Occupational Safety and Health Administration ("OSHA") investigation into Hicks' death resulted in no citation, as no OSHA standard had been violated. The second incident occurred in South Carolina on 31 July 1990, when lineman Randy Pyatt fell fifty-eight feet and was severely injured. Between the two incidents, defendant's employees worked over eleven million man-hours aloft wearing only a body belt and pole strap combination for fall protection without a single accident involving known or suspected roll-out.

At the time of his injury, Pyatt, like Mickles, was wearing a Klein body belt and a Buckingham pole strap. Pyatt's pole strap was manufactured in 1984, whereas Mickles' strap was issued in 1986. Defendant mixed straps and belts from different manufacturers because it purchased equipment from the lowest bidder on the approved standards list.

Following Hicks' accident, defendant informed its employees about roll-out, instructing them to check the snap hook and D-ring for proper alignment before placing their full weight on the equipment. Defendant also suggested that vendors of the body belts redesign

D-rings to make them less susceptible to roll-out. Finally, defendant investigated the possibility of using "double locking safety snaps," which require two distinct motions to disengage the snap, but it concluded that these snaps were more dangerous than single-locking snaps because linemen wearing rubber gloves needed both hands to unhook the snap before moving and rehooking. Although defendant made double-locking snap hooks available to linemen, few actually used them.

Following Pyatt's accident, two of defendant's employees, Dee Putnam and John Francis, inspected Pyatt's body belt and safety strap. Francis then wrote two memoranda to defendant's legal department in which he summarized his findings. Because experts would testify that safety strap snap hooks and D-rings made by different manufacturers are not always compatible, Francis suggested that two engineers of his choosing examine belts and straps for mix/match compatibility. He further suggested that defendant not pursue a fall-arrest system at that time for several reasons. According to Francis, if defendant were to adopt a fall-arrest system, this would indicate to linemen that roll-out was a "recognized hazard." In addition, suggesting the necessity of a fall-arrest system would be in direct conflict with what defendant and other electric utility companies had pleaded before the federal OSHA panel when it was formulating safety regulations. Putnam disagreed with Francis' suggestion that defendant not pursue a fall-arrest system.

In his second memorandum, Francis noted that tests on Pyatt's body belt and pole strap revealed that roll-out would not occur when the safety strap remained untwisted. When Pyatt's safety strap was tested using four other manufacturers' D-rings, roll-out did not occur whether the strap was twisted or untwisted. However, testing with Pyatt's Buckingham body belt revealed that whenever the pole strap became twisted, the snap hook would invert, the snap hook keeper would lodge against the inside of the D-ring, and the D-ring would disengage from the snap hook whenever body pressure was placed upon the connection. Later testing of Mickles' equipment provided similar results.

On 16 October 1990, Francis took Pyatt's equipment to Buckingham's Binghamton, New York, facility for testing. Buckingham issued a safety notice later that month which recalled Buckingham safety straps manufactured from 1982 through 1984. Defendant fully complied with the recall. In addition, defendant

issued a safety alert regarding roll-out; sent written and verbal reports to Mickles' crew concerning Pyatt's accident; and conducted equipment inspections of all belts and straps in January, May, and July 1991. Mickles' equipment was inspected on each occasion.

In late 1990, defendant began investigating the possibility of obtaining more effective fall protection equipment for its transmission linemen. Defendant worked with a foreign company in an effort to custom design a safety harness. At that time, the body belt and pole strap combination was the only feasible means of fall protection for transmission linemen in the country.

Defendant was not cited for OSHA violations after either Hicks' or Pyatt's accident. Following Mickles' accident, defendant inspected Mickles' equipment and found it to be in compliance with all applicable OSHA regulations. The North Carolina Department of Labor ("NCDL") nevertheless conducted an investigation. Carl Collins, the NCDL inspector, asserted in his affidavit that before Mickles' death, manufacturers of fall protection equipment recommended in their catalogs that body belts and pole straps not be used for fall protection because of the potential incompatibility of belts and straps made by different manufacturers. Collins asserted that defendant was aware of this problem but merely requested its linemen to inspect the connection while working. Defendant was also aware that additional safety devices were available, but it did not require its workers to use such devices. According to Collins, prior to Mickles' death defendant had not educated or trained its linemen on how to inspect their body belts and pole straps to determine whether roll-out was possible. However, Mickles apparently received such training before his fall, as his initials appear on a copy of the 1990 Pyatt accident report.

Following the investigation, Collins cited defendant for wilful violations of 29 C.F.R. § 1910.132(a) and (c). Administrative Law Judge Carroll Tuttle, an OSHA hearing examiner, dismissed the alleged violation of subsection .132(a). Tuttle further rejected the NCDL's charges of wilfulness regarding defendant's violation of subsection .132(c), determining that the violation had been "serious" but not wilful. In so finding, Tuttle determined that defendant did not purposely expose its employees to the hazard of roll-out. Tuttle noted that the equipment defendant provided was the equipment provided throughout the United States for fall protection.

Plaintiff's expert, Jack Larks, a member of the American National Standards Institute, stated in his affidavit that the industry has known

for a long time that one of the most critical factors causing roll-out is the relative dimension of the snap hook to the D-ring. Some snap hooks and D-rings are therefore incompatible. Larks stated the equipment provided to Mickles "was certain to fail under the conditions created using [defendant's] standard work procedures." He stated again: "Using [defendant's] standard work procedures, the equipment provided to David Mickles was absolutely certain to fail." One such procedure involved taking two steps up the ladder and then two steps down; as a result of this maneuver, slack would be introduced into the safety strap and the strap would then become twisted. Testing of Mickles' equipment following his death revealed that the snap hook and D-ring disengaged nine out of ten times when this standard procedure was followed. Larks opined that defendant knew, due to Hicks' and Pyatt's accidents, that sending its linemen up transmission towers with incompatible body belts and pole straps as their only safety equipment was a hazard certain to cause death or serious injury. Collins, the NCDL inspector, and Larks agreed that a fall from one hundred feet would result in death ninety-eight percent of the time.

The Workers' Compensation Act, N.C.G.S. §§ 97-1 to -101 (1991) ("the Act"), provides the exclusive remedy for a person injured in a workplace accident. *See* N.C.G.S. §§ 97-9, -10.1. In *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991), this Court enunciated an exception in the following situation:

> [W]hen an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct, that employee, or the personal representative of the estate in case of death, may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act.

*Woodson*, 329 N.C. at 340-41, 407 S.E.2d at 228. This narrow exception arose from the following facts. The decedent, a sewer worker, died when a ditch caved in on him. The decedent's employer, a subcontractor, had been cited four times in the previous six-and-a-half years for violating trenching regulations. A trench box, a specific requirement of the state Occupational Safety and Health Act, was not used. Evidence indicated that decedent's employer, who had spent most of his career excavating soil, knew of the substantial certainty that the

trench would fail and nevertheless had directed that the work proceed without a trench box.

Here, the Court of Appeals determined that the forecast of evidence was sufficient under the *Woodson* exception to the exclusive remedy provisions of the Act to overcome defendant's motion for summary judgment. It found persuasive the fact that defendant, following the Buckingham recall, apparently never examined its remaining inventory for incompatible equipment. In addition, the Court of Appeals cited as evidence of intentional misconduct: (1) the report and recommendation of Carl Collins, the NCDL investigator; (2) John Francis' memo indicating defendant understood the danger of incompatible equipment; and (3) defendant's decision not to pursue additional safety equipment even though it was aware that such equipment was available. *Mickles*, 115 N.C. App. at 632-33, 446 S.E.2d at 374-75.

In so holding, the Court of Appeals suggested that the following from the Restatement (Second) of Torts illustrates misconduct which satisfies *Woodson's* "substantial certainty" test:

A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

Restatement (Second) of Torts § 8A illus. 1 (1965). This was also quoted as an illustration of "substantial certainty" in *Powell v. S & G Prestress Co.*, 114 N.C. App. 319, 325, 442 S.E.2d 143, 147 (1994), *aff'd*, 342 N.C. 182, 463 S.E.2d 79 (1995) (per curiam), which was quoted with apparent approval in *Echols v. Zarn, Inc.*, 116 N.C. App. 364, 378, 448 S.E.2d 289, 297 (1994), *aff'd*, 342 N.C. 184, 463 S.E.2d 228 (1995) (per curiam). We now disavow this example. According to well-known principles of tort liability, one who intentionally engages in conduct knowing that particular results are substantially certain to follow also intends those results for purposes of tort liability. *See Woodson*, 329 N.C. at 341, 407 S.E.2d at 229. In the above example, A is *actually* certain his act will injure or kill C. A successful claim under the *Woodson* exception does not require such actual certainty.

The forecast of evidence nevertheless failed to establish a claim under the *Woodson* exception because it did not establish that

## MICKLES v. DUKE POWER CO.

[342 N.C. 103 (1995)]

defendant knew its conduct was substantially certain to cause serious injury or death to Mickles. Mickles and other employees received training in guarding against roll-out. Defendant had never been cited for an OSHA violation regarding roll-out, and OSHA standards at the time of Mickles' death neither required a fall-arrest system nor addressed equipment compatibility. Judge Tuttle, the OSHA hearing examiner, specifically determined that defendant did not wilfully expose its employees to the hazard of roll-out. Although the Court of Appeals noted that defendant did not examine its remaining inventory for incompatible equipment following the Buckingham recall, no such examination was statutorily required. Moreover, despite Francis' suggestion that defendant not pursue a fall-arrest system in the fall of 1990, defendant in fact did so and was field-testing a custom-designed system several months before Mickles' death. Fall-arrest systems were on the market at the time of Mickles' death, but evidence was presented showing that none of the available models was compatible with defendant's employees' equipment. Between the 1975 and 1990 falls, defendant's employees worked over eleven million man-hours aloft without a single incident of roll-out, and roll-out had occurred in testing *only* when the pole strap became twisted, slack was introduced into the strap, and then pressure was brought to bear upon the snap hook and D-ring connection.

Larks' opinion that Mickles' equipment was absolutely certain to fail using defendant's standard work procedures, and that defendant knew this, was based in significant part on testing of Mickles' equipment following his death. There is no evidence that defendant was aware, prior to Mickles' death, of a high probability that this equipment would fail. In view of the uncontroverted evidence that while roll-out occurs, it is rare, and that except for three widely scattered instances over a sixteen-year period, defendant's linemen had spent millions of man-hours aloft with no roll-out, Larks' opinion is inherently incredible. Such evidence does not suffice to create a genuine issue of material fact for purposes of determining the appropriateness of summary judgment. *See* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 132, at 592 n.81 (3d ed. 1988) (when expert opinion, tested by facts in evidence, is inherently incredible, exclusion dictated). Under the Rules of Civil Procedure, as under the former practice,

"[j]udges are [not] required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence [is] of such a character

as [to] warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence."

*Lee v. Stevens*, 251 N.C. 429, 434, 111 S.E.2d 623, 627 (1959) (quoting *Byrd v. Express Co.*, 139 N.C. 273, 276, 51 S.E. 851, 852 (1905)).

The forecast of evidence thus indicates only that defendant was aware of the somewhat remote possibility that Mickles' strap would become twisted, slack would be introduced into the strap, and Mickles would then fail to check the connecting snaps and D-rings before leaning against those connections. It falls short of establishing that defendant knew this was substantially certain to occur.

This Court has applied *Woodson* on only one other occasion. In *Pendergrass v. Card Care, Inc.*, 333 N.C. 233, 424 S.E.2d 391 (1993), we upheld a judgment granting defendants' Rule 12(b)(6) motions to dismiss. Plaintiff had alleged that his employer had designed a defective machine, the machine had improper and hazardous pinch-points, the employer had not made necessary safety devices available (in violation of OSHA regulations), and the employer knowingly directed plaintiff to use the machine without safety devices. *Id.* at 236, 424 S.E.2d at 393. This Court held that the negligence plaintiff alleged did not rise to the level of wilful, wanton, and reckless negligence as defined in *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985). *Pendergrass*, 333 N.C. at 237-38, 424 S.E.2d at 394. Therefore, it did not rise to the higher level of negligence defined in *Woodson*, that is, negligence substantially certain to produce injury or death. *Id.* at 239-40, 424 S.E.2d at 395.

In *Pendergrass*, a knowing failure to provide adequate safety equipment in violation of OSHA regulations did not give rise to liability under the *Woodson* exception to the exclusivity rule. Here, plaintiff did not, and could not, allege or prove such a failure because OSHA had no regulations regarding roll-out at the time of Mickles' accident. The forecast of evidence here is even less indicative of employer misconduct with knowledge that it is substantially certain to cause serious injury or death than were the allegations in *Pendergrass*, where we upheld a judgment for defendants. Accordingly, it did not suffice to survive summary judgment.

The trial court correctly determined that plaintiff failed to forecast evidence sufficient to create a genuine issue of material fact regarding defendant's liability under the *Woodson* exception to the exclusivity provisions of the Act. The Court of Appeals thus erred in

reversing the entry of summary judgment for defendant. The decision of the Court of Appeals is reversed; the case is remanded to that court for further remand to the Superior Court, Forsyth County, for reinstatement of the order of summary judgment for defendant.

REVERSED AND REMANDED.