[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 RE MOTION FOR SUMMARY JUDGMENT (No. 139)
As recent events in Massachusetts have reminded us, firefighting is heroic and extraordinarily dangerous work. Michael Ramos, the plaintiff in this case, knows this grim fact all too well, for he is the administrator of the estate of Edward Ramos, a Branford firefighter who tragically died in the line of duty. (In this opinion, the name "Ramos" will hereinafter refer to Edward Ramos, the plaintiffs decedent.) There is no question that Ramos' estate is entitled to compensation under the Workers' Compensation Act, Conn. Gen. Stat. § 31-275 et seq., for Ramos' death. The question presented by the motion for summary judgment now before the Court is whether the exclusivity provision of the Act, Conn. Gen. Stat. § 31-284(a), bars the tort suit that the plaintiff has now brought against the Town of Branford and certain of its officials for that death. For the reasons set forth below, this question must be answered in the affirmative.
Ramos, a volunteer firefighter with the Branford Fire Department, died while fighting a fire in a commercial building located at 43 School Ground Road in Branford on November 28, 1996. The plaintiff administrator commenced this action by service of process on November 25, 1997. Although there are a number of defendants, the only defendants involved for purposes of the present motion are the Town of Branford and Peter Buonome, the Chief of the Branford Fire Department.
The plaintiffs amended complaint states two counts against these defendants. These counts refer to Buonome as the "Defendant." The first count alleges a reckless failure to implement policies. It specifically alleges that: CT Page 16295
 For a substantial period of time prior to said fire the Defendant recklessly failed to promulgate, implement and enforce policies with respect to matters including, but not limited, to:
a. Fire fighter training;
b. Fire ground procedures
c. Pre-fire planning of commercial buildings;
d. Fire ground emergency rescue procedures;
e. The use of safety equipment;
f. The use of self contained breathing apparatus;
 g. The accountability of departmental personnel, including EDWARD RAMOS, on the fire ground;
 h. Effective fire ground radio communications and a dedicated fire ground channel; and
I. The use of a fire ground management system.
Amended Complaint, First Count ¶ 11. The first count further alleges that, "The Defendant knew or should have known that serious injury or death to Branford fire department personnel including EDWARD RAMOS was substantially certain to occur as a result of his failure to promulgate, implement and enforce such policies." Id. ¶ 13.
The second count alleges that Buonome had a mandatory duty, pursuant to Conn. Gen. Stat. § 29-305, to conduct annual inspections of commercial properties in Branford, including the premises at 43 School Ground Road. It further alleges that, "For a substantial period of time prior to said fire the Defendant recklessly failed to conduct such annual inspections of the premises at 43 School Ground Road." Amended Complaint, Second Count ¶ 13. It then alleges that, "The Defendant's failure to conduct such inspections . . . resulted in his failure to discover that the premises had a roof that was constructed of lightweight wood trusses, that it lacked automatic sprinkler protection, and that it contained highly flammable materials that promote the rapid spread of fire." Id. ¶ 14. It further CT Page 16296 alleges that, "The Defendant knew or should have known that serious injury or death to Branford fire department personnel including EDWARD RAMOS was substantially certain to occur as a result of his failure to conduct such annual inspections of the premises at 43 School Ground Road." Id. ¶ 17.
On March 16, 1999, Buonome and the Town filed the motion for summary judgment now before the Court. The motion seeks summary judgment on the first and second counts of the amended complaint on the ground that the Workers' Compensation Act provides the plaintiffs exclusive remedy. (The motion does not attack the remaining counts of the amended complaint, which are directed against other defendants.) The motion was argued on October 12, 1999. Postargument submissions were subsequently made by both parties at the invitation of the Court. These submissions were completed on December 7, 1999.
It is common ground between the parties that Ramos' status as a volunteer firefighter at the time of his death brought him within the protection of the Workers' Compensation Act. See 4 ARTHUR LARSON LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW ("LARSON") § 78.04[3] at 78-10 (1999). The dispute focuses on the applicability of the exclusivity provision of Conn. Gen. Stat. § 31-284(a).
The exclusivity provision is "a total bar to common law actions brought by employees against employers for job related injuries with one narrow exception that exists when the employer has committed an intentional tort or where the employer has engaged in wilful or serious misconduct." Suarez v. DickmontPlastics Corp. , 229 Conn. 99, 106, 639 A.2d 507 (1994). The plaintiff in this case does not allege that either Buonome or the Town committed an intentional tort. The first two counts of the amended complaint sound in recklessness. The question is, consequently, whether "the employer has engaged in wilful or serious misconduct."
Suarez narrows the analytical focus even further. Suarez
explains that, if the employer did not have a specific intent to injure the employee, the case is to be resolved by the "substantial certainty test." 229 Conn. at 109. Under this test, "[t]he known danger involved must go from being `a foreseeable risk which a reasonable man would avoid and become a substantial certainty.' W. Prosser, Torts (4th Ed. 1971) § 8, p. 32." Id. Since the plaintiff does not allege that Buonome had a specific CT Page 16297 intent to injure Ramos, the substantial certainty test is the brass ring that he seeks to grasp in this litigation.
This scenario presents two major questions. The first is an important legal problem. To what extent can the substantial certainty test, designed in cases like Suarez to promote safety in the industrial workplace, be sensibly applied in the quite different, and inherently dangerous, "workplace" of a firefighter? Assuming that the substantial certainty test applies in some form, the second question is whether the plaintiff has submitted facts that appropriately bring him within the ambit of the test. These questions will be addressed in turn.
The case law makes it clear that the substantial certainty test is a test created by the courts to promote safety in the industrial workplace. Suarez is a good example. The plaintiff in that case, Alfonso Suarez, was severely injured while working for the Dickmont Plastics Corporation "when, while attempting to clear hot molten plastic out of a plastic molding machine, two of his right hand fingers became caught in the machine and were partially amputated." 229 Conn. at 101. Other important "substantial certainty" cases have involved similar factual settings. Mingachos v. CBS, Inc., 196 Conn. 91, 491 A.2d 368
(1985), a significant case on which Suarez relies, involved the death of an employee in a chemical explosion alleged to have been caused by the defendants in the building in which he worked. An out-of-state case on which Suarez also heavily relies, Beauchampv. Dow Chemical Co., 398 N.W.2d 882 (Mich. 1986), was a suit by a research chemist who alleged injury caused by exposure to Agent Orange. Beauchamp, in turn, principally relies on three cases decided by courts of other jurisdictions. 398 N.W.2d at 891-93.Griffin v. George's, Inc., 589 S.W.2d 24 (Ark. 1979), involved a 17-year-old employee of a grain dealer who stepped on loose grain and fell into an unguarded grain auger. Id. at 25. Serna v.Statewide Contractors, Inc., 429 P.2d 504 (Ariz.Ct.App. 1967), involved the death of two ditch diggers who were killed when an improperly shored 25-foot-deep ditch caved in, burying them alive. Id. at 505. People v. Film Recovery Systems, an unreported Illinois manslaughter case, involved workers poisoned by vats of cyanide. Beauchamp v. Dow Chemical Co., supra,398 N.W.2d at 892-93. All of these cases involved shockingly unsafe workplaces maintained by employers. As a matter of public policy, the courts will not allow corporations maintaining such workplaces "to `cost-out' an investment decision to kill workers." Suarez v.Dickmont Plastics Corp., supra, 229 Conn. at 109. (Citation and CT Page 16298 internal quotation marks deleted.)
The creation and maintenance of safe industrial workplaces is a worthy and (one hopes) achievable goal of tort law. Thus, we want companies employing workers to provide them with appropriately guarded molding machines (Suarez), guarded grain augers (Griffin), shored ditches (Serna), and protection from vats of cyanide (Film Recovery). We like to think that employers, given the judicial stick of the substantial certainty test, will be persuaded to provide safe workplaces, and that we will one day attain a state of real industrial safety that will, at least in part, be attributable to judicial decisions like Suarez.
This logic, however, is not easily transferred to the "workplace" of a firefighter like Edward Ramos. Several problems must be confronted. First, and perhaps foremost, firefighters will never enjoy a safe workplace no matter what the efforts of their employers. The very nature of their profession dictates otherwise. Firefighters are popularly termed the "bravest" for good reason. Their job frequently requires them to serve the public by risking their lives in burning buildings. An Illinois firefighter observed in the aftermath of the recent Massachusetts tragedy that, "All of us in this station have been on calls where somebody's been carried out of a burning building on a firefighter's back." Dirk Johnson, Firefighters Reflect on a Jobof Great Risks and Rewards, N.Y. TIMES, December 12, 1999, at 33. The Supreme Court of Colorado observed long ago that:
 The life of a fireman is an heroic one. Daily, in the discharge of his duties, he performs acts of the truest heroism, which go down unheralded and unsung. He consecrates his life to his work, and, when it becomes necessary, unflinchingly offers up, as a sacrifice to the public, his own well-being, his life, and the future welfare of his wife and children.
Lunt v. Post Printing Publishing Co., 110 P. 203, 210 (Colo. 1910). No judicially created rule of tort law can hope to alter this stark reality.
The dangerous nature of a firefighter's profession has been judicially recognized in the "firefighter rule," which "gives a firefighter the status of a licensee in a personal injury action against a landowner for harm sustained during the course of duty." Lodge v. Arett Sales Corp. , 246 Conn. 563, 580 n. 12,717 A.2d 215 (1998). The firefighter rule is not directly applicable CT Page 16299 in this case because this is not an issue of landowner liability.Id. The importance of the rule, for purposes of this case, lies both in its recognition of the dangers inevitably faced by firefighters and the reasoning of the case law articulating the rule that firefighters "have been compensated for their risk by society as a whole by way of workers' compensation as well as other statutory benefits provided to injured firefighters." Id.
at 580. (Emphasis added.) Accord Furstein v. Hill, 218 Conn. 610,619, 590 A.2d 939 (1991). See Krauth v. Geller, 157 A.2d 129, 131
(N.J. 1960); Lunt v. Post Printing Publishing Co., supra, 110 P. at 210. Our courts have thus made the express calculation that firefighting is an extraordinarily risky profession and that the public, as a matter of policy, has decided to compensate firefighters for that risk with statutorily defined benefits, including workers' compensation. This is a markedly different calculus from the reasoning that underpins cases like Suarez
dealing with more conventional workplace environs.
It must additionally be recognized that a firefighter's employer does not control the firefighter's "workplace" in the way that the Dickmont Plastics Corporation controlled the plastic molding machine that injured Alfonso Suarez. Only rarely will a firefighter be called to combat a fire in his own fire station. The typical fire, as was the case here, will occur on premises controlled by third parties. While appropriate inspection and safety procedures implemented by the fire department can doubtless enhance the safety of firefighters in some circumstances, no known procedure will change the fact that firefighters will inevitably be called upon to enter burning buildings controlled and maintained by other people.
Another way of looking at this problem is in terms of mathematical probabilities. Suarez, as mentioned, teaches us that a "substantial certainty" is something greater than "a foreseeable risk which a reasonable man would avoid."229 Conn. at 109. An earlier decision, Mingachos v. CBS, Inc., supra, explains that a substantial certainty is even more than "a strong probability." 196 Conn. at 103. Similarly, Beauchamp v. DowChemical Co., on which Suarez relies, stresses that, "substantial certainty should not be equated with substantial likelihood."398 N.W.2d at 893. As the Professors Larson point out in their treatise, the injury from inhaling the fumes from the vats of cyanide in the Film Recovery case was, indeed, virtually certain to occur and met the test. 6 LARSON § 103.05[6] at 103-41-42. Injury from clearing the hot molten plastic out of the plastic CT Page 16300 molding machine in Suarez was perhaps less certain, but at least the question of substantial certainty was a plausible jury question. In each of those cases, moreover, the courts could hope that, by the use of appropriate safety measures, the odds of injury could be reduced from substantial certainty to something close to zero. This is not the England of Dickens, and there is no reason in the modern age that industrial workplaces cannot be made safe.
The firefighter's profession must now be considered with this calculus in mind. There are undoubtedly times when injury to a firefighter is as certain and predictable as the injury to the employees in Film Recovery. The heroic firefighters who recently lost their lives in Massachusetts doubtless realized the extraordinary risk to their lives when they entered the burning warehouse in an effort to rescue others. But this is only part of the equation. Firefighters will always have a significant risk hanging over their heads and — both because of the innate risk of the profession and because of the inescapable fact that they will be called to premises controlled by third parties — the risk will never be reduced to anything approaching zero.
The firefighter case thus presents a quite different set of probabilities than the set of probabilities considered in Suarez. In Suarez, we have, on the one hand, a substantial certainty of injury caused almost entirely by unsafe conditions maintained by the employer. If the judicial stick provided by the substantial certainty test proves effective, however, this risk can be reduced to something near zero. Use of the substantial certainty test under these circumstances makes considerable sense.
In the firefighter case, in contrast, the very nature of the profession dictates that firefighters will always face a cognizable risk of injury or death. This risk might be somewhat reduced by appropriate safety and inspection procedures, but it will never be reduced to anything approaching zero — no matter what the employer does. Moreover, in situations like the recent Massachusetts tragedy, where a firefighter's professionalism and heroism impel him to enter a burning building to rescue other people, the risk of injury and death might well rise to a substantial certainty — again, no matter what the employer does. The substantial certainty test is simply not designed to deal with this scenario.
Does this mean that the substantial certainty test should CT Page 16301 never be used in the firefighter situation? That is a plausible analysis, but it is not necessary to make such a sweeping statement in this case. One can imagine situations involving especially outrageous facts quite removed from the present case where the test might be appropriate. Suppose a fire department, in an effort to save money, knowingly gave its firefighters flammable uniforms. The department might hope that the uniforms would never catch fire, but it would nevertheless be a substantial certainty that this would happen. Other scenarios involving similar outrageous facts can doubtless be imagined, but such scenarios are far removed from the facts of this case. The substantial certainty test simply cannot be sensibly applied to the facts at hand.
The analysis so far is enough to dispose of the present case. However, in the event that a reviewing court should disagree with this analysis, it is appropriate to consider how the substantial certainty test should be applied to the facts submitted by the parties.
The submissions of the parties must now be reviewed. The defendants have submitted an affidavit of Buonome stating that he "had no knowledge or information at any time prior to the November 28, 1996 fire that Edward Ramos' death was substantially certain to occur at any time, at any location, or as a result of any alleged act or omission of [his]." A second affidavit signed by Buonome states that even if an annual inspection under Conn. Gen. Stat. § 29-305 had been performed on the premises in question, "none of the conditions identified in the Second Count of plaintiffs Complaint would have ben reported, because none of these conditions constituted a violation of any pertinent statute or regulation." Buonome's second affidavit further states that a pre-fire plan was not required for the premises in question and that an improved accountability system for fire ground operations, involving the use of photographic identification cards, had been developed in the 1 1/2 year period prior to the fire. Buonome has also submitted extensive Standard Operating Procedures in effect at the time of the fire.
The plaintiff, in response, has submitted two affidavits. Neither affidavit contains facts establishing a basis of personal knowledge. The plaintiffs first affidavit is that of Samuel A. Maglione, who describes himself as "an expert in performing fire loss and fire code analysis." After reviewing his credentials, Maglione states as follows: CT Page 16302
 6. I have reviewed the above captioned case and I am familiar with the facts and circumstances resulting in the death of volunteer firefighter Edward Ramos during active duty on November 28, 1996 while fighting a fire in a commercial building located at 43 School Ground Road in Branford, Connecticut.
 7. I intend to testify as an expert witness on behalf of the plaintiff in this action.
 8. Fire Departments nationwide utilize and train and certify their firefighters is [sic] the use of self contained breathing apparatus which are used by firefighters entering burning buildings to protect them from death caused by smoke inhalation. Fire Departments nationwide also use accountability systems to document which firefighters enter a burning building so that, in the event a firefighter does not exit a burning building, fire fighters know to make an immediate rescue attempt. Fire Departments nationwide also comply with statutorily mandated fire inspections of commercial buildings in an effort to protect the lives of people who enter such buildings and firefighters who may be called upon to fight a fire in a commercial building.
 9. It is my expert opinion that, given the defendant Peter Buonome's knowledge and expertise in firefighting procedures, as he is the Chief and Fire Marshall of the Fire Department of the town of Branford, Connecticut, Buonome's failure to properly train and certify Edward Ramos in the use of a self-contained breathing apparatus, before sending Ramos into a burning building, and Buonome's failure to implement an accountability system to account for Ramos' presence in the burning building, which resulted in a fatally belated attempt to rescue Ramos, in addition to Buonome's failure to conduct statutorily mandated fire inspections of commercial buildings were intentional acts necessarily committed with knowledge that the injury or death of a firefighter, including Edward Ramos, was substantially certain to result.
The second affidavit submitted by the plaintiff is that of his attorney, George H. Romania. Attorney Romania does not claim any personal knowledge of the events m question. Rather, his affidavit serves as a conduit for a number of documents claimed to be evidence. These documents are: (1) a Fire Investigation Report of the National Fire Protection Association ("NFPA") concerning the fire in question (the NFPA Report is also contained in the materials submitted by Buonome); (2) a Citation CT Page 16303 and Notification of Penalty by the State of Connecticut Department of Labor Division of Occupational Safety and Health to the Town of Branford dated January 31, 1997; (3) a copy of Ramos' Fire Department record indicating that his only certification was as an EMT; (4) minutes of a meeting of the Branford Board of Fire Commissioners on January 25, 1996 indicating that the Board directed the Chief "to establish a program for compliance with Conn. O.S.H.A. Training Standards as set forth in required minimum training for CT. fire services"; (5) a May 15, 1996 memorandum to Buonome from Deputy Chief Hackett requesting implementation of "a fireground accountability policy that can be used by ALL members [of] our department"; (6) a July 1, 1996 memorandum from Deputy Chief Hackett again asking for implementation of a fireground accountability procedure; (7) a July 11, 1996 memorandum to Buonome requesting filter masks to prevent "airborne infectious disease" (the relevance of this request to the case at hand is not at all clear); (8) a July 13, 1996 memorandum from Buonome announcing a nonmandatory ten-week recruit fire training class; and (9) a Fire Department designation of Ramos as an interior firefighter but indicating no certification or training.
Some of these submissions are inappropriate under our rules. Practice Book § 17-46 requires that, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." For differing reasons, the Maglione affidavit, the Romania affidavit, and the NFPA Report fail to satisfy this requirement.
The Maglione affidavit presents multiple evidentiary problems. In the first place, it is not at all clear that Maglione's opinion is based on personal knowledge. He states that he is "familiar with the facts and circumstances" of the fire in question but does not state just what those facts and circumstances are. Is Maglione familiar with any of the documents subsequently submitted by Attorney Romania? If so, he does not say. Maglione further states that Buonome's asserted failures were "intentional acts." Did he at any time interview Buonome or, for that matter, anyone who knew Buonome prior to arriving at this conclusion? If so, he does not say. Because of Maglione's repeated failure to condescend to the particular, it simply cannot be said that his opinion is based on personal knowledge. The absence of personal knowledge "can be fatal." Suarez v.CT Page 16304Dickmont Plastics Corp., supra, 229 Conn. at 108.
Beyond this, it is well established that the courts have a "gatekeeper" role which requires them to scrutinize proffered "expert" testimony of dubious reliability. See Kumho Tire Co. v.Carmichael, 119 S.Ct. 1167 (1999); State v. Porter, 241 Conn. 57,698 A.2d 739 (1997); Conn. Code of Evidence § 702 (effective January 1, 2000) and commentary appended thereto. The Maglione affidavit is sufficiently devoid of facts establishing personal knowledge that it cannot be said to be reliable. It does not meet the threshold requirements of P.B. § 17-46 and Code of Evidence § 702.
The Romania affidavit is plainly a mere conduit for the documents appended thereto. The affiant asserts no personal knowledge. An affidavit by a party's attorney is ordinarily inappropriate in any event. Farrell v. Farrell, 182 Conn. 34, 37
n. 2, 438 A.2d 415 (1980).
The NFPA Report is not an affidavit at all. It is plainly a hearsay document since it is an out-of-court statement offered in evidence to establish the truth of the matter asserted. It does not come within the hearsay exception for public records and reports since it is not a report made by a public official or agency. See Conn. Code of Evidence § 803(7) and commentary appended thereto. The Report contains no facts indicating that the NFPA is a public agency.
The Citation and Notification of Penalty prepared by the State Labor Department Division of Occupational Health and Safety must now be considered. The State Labor Department is, of course, a public agency. But is the Citation and Notification of Penalty a "report," as Attorney Romania terms it in his affidavit? On its own terms, it is not. It is, instead, an accusation that the Town has a right to contest. Id. at 2. The record is silent as to whether the Citation has, in fact, been contested. Under these circumstances, the Citation remains simply an accusation. Accusations are ordinarily inadmissible unless they bear on such matters as bias, motive, or warning. There is nothing in the record to indicate that the Citation here would be admissible for any such purpose. As discussed below, it is especially significant that the Citation could not be used as evidence of warning, since it came after, rather than before, the event in question. CT Page 16305
The plaintiff was free to submit affidavits based on personal knowledge from inspectors and ordinary eyewitnesses alike. He has not done so. On the record presently before the Court, the only affidavits based on personal knowledge are those of Buonome. Under these circumstances, summary judgment appropriately should enter for the defendants. Mingachos v. CBS, Inc., supra,196 Conn. at 114. See Suarez v. Dickmont Plastics Corp., supra,229 Conn. at 108.
In view of the gravity of the case, it is appropriate to explain briefly my further conclusion that, even if the substantial certainty test were applicable to the present case and even if I were to treat the plaintiffs submissions as admissible in their entirety, the defendants' motion for summary judgment must be granted in any event.
As described above, the plaintiffs claim is based on the defendants' asserted failure to promulgate, implement, and enforce certain safety policies and conduct inspections. While the materials submitted by the plaintiff are sufficient to show negligence, they do not establish the facts required by the substantial certainty test. Failures to provide proper training, procedures and equipment and to conduct inspections of the sort in question here ordinarily do not satisfy the substantial certainty test. See LARSON § 103.03 at 103-6-8; 82 AM. JUR. 2D Workers' Compensation § 79 (1992); and authorities cited therein.
It is useful to contrast the facts in this case with those inSuarez, where a jury issue as to substantial certainty was found.Suarez explains that the plaintiff in that case had submitted facts indicating that:
 [T]he defendant: (1) always required the plaintiff and other employees to clean the plastic molding machine while it was in operation; (2) refused to allow the plaintiff or other employees to use safer cleaning methods; and (3) refused to equip the machine with a protective cover or other device in order to prevent injuries to persons operating or cleaning it.
229 Conn. at 101.
The plaintiff in the present case has not submitted facts bringing him within the Suarez ambit. While the defendants' asserted failures might result in risks which a reasonable person CT Page 16306 would avoid, there is nothing in this case approaching substantial certainty. As discussed above, under Connecticut case law, a substantial certainty is more than a foreseeable risk that a reasonable person might avoid and more than even a strong probability. There is no evidence that, prior to Ramos' death, the defendants were aware that his, or any other firefighter's, death was substantially certain to occur as a result of their asserted failure to implement policies or conduct inspections. Maglione's conclusory statement on this point, for reasons already discussed, is not grounded in the evidence and caries no weight. The State Department of Labor Citation came after the event, not before it. See Mickles v. Duke Power Co.,463 S.E.2d 206, 210-12 (N.C. 1995). There is nothing in the record to indicate that any Branford firefighter had previously been injured as a result of the asserted failure. Id. Indeed, there is nothing in the record to indicate that Ramos himself was killed as a result of the asserted failure. Even Maglione never says that Ramos' life would have been saved had the policies in question been implemented and inspections been conducted. This is not to say that it was not well known to all concerned that firefighting is an intrinsically dangerous profession in which the risk of injury or death is always present. That knowledge surely existed. The crucial point is that there is nothing in the record to indicate that the defendants knew that their asserted policy and inspection failures raised this risk to a substantial certainty.
Under these circumstances, there is no genuine issue of material fact for purposes of determining the appropriateness of summary judgment. The case, in this state of the evidence, would not be submitted to the jury. Mickles v. Duke Power Co., supra,463 S.E.2d at 212. The motion for summary judgment must be granted.
Jon C. Blue Judge of the Superior Court